In re Joseph A. VAUSE and Virgie L. Vause, Debtors.

Joseph A. VAUSE and Virgie L. Vause, Plaintiffs–Appellees,

v.

CAPITAL POLY BAG, INC., Defendant–Appellant.

No. 88–4096.

United States Court of Appeals, Sixth Circuit.

Argued July 27, 1989.

Decided Sept. 25, 1989.

Thomas C. Scott, Thompson, Hine & Flory, Columbus, Ohio, for debtors.

Thomas R. Allen (argued), Thomas C. Scott, Columbus, Ohio, for plaintiffs-appellees.

Kenneth C. Johnson (argued), Sue A. Wyskiver, Bricker & Eckler, Columbus, Ohio, for defendant-appellant.

Before: KENNEDY and KRUPANSKY, Circuit Judges, and MILES, Senior District Judge.*

* The Honorable Wendell A. Miles, Senior District Judge for the Western District of Michigan, sitting by designation.

KENNEDY, Circuit Judge.

Defendant-appellant, Capital Poly Bag, Inc. (CPB) appeals the District Court's order affirming the Bankruptcy Court's denial of its claim for pre-petition rent.[1] The debtors, Joseph and Virgie Vause, filed a Chapter 11 bankruptcy petition on November 27, 1985, and concurrently requested permission to reject their lease. The lease required annual rent payments to CPB in arrears on December 1st of each year. CPB filed a $72,000 claim; $36,000 for 361 days' unpaid pre-petition rent as past damages under 11 U.S.C. § 502(b)(6)(B), and $36,000 for one year's post-petition rent as future damages under 11 U.S.C. § 502(b)(6)(A).

In deciding a question of first impression, the Bankruptcy and District Courts held that the lessor could not claim pre-petition rent because the plain language of section 502(b)(6)(B) limits a lessor's claim under a rejected lease to the amount of rent "due under [the] lease"; the rent for the past 361 days was not yet "due and payable" for another four days under the specific terms of CPB's lease on the date of the bankruptcy filing. While the Bankruptcy and District Courts' reading of section 502(b)(6)(B) may be correct in a narrow and technical sense, their "plain meaning" analysis is not instructive in this case because the word "due" has two possible meanings—"matured and payable" or "owing"—and is inherently ambiguous. A broader and more reasonable interpretation of the statute is supported by the statutory language, legislative history, and avoiding an inequitable result that Congress clearly could not have intended. Accordingly, we reverse in part and affirm in part.[2]

1. The Bankruptcy Court's decision is reported at 72 B.R. 647 (S.D.Ohio 1987). The District Court's decision, is reported at 105 B.R. 399 (S.D.Ohio 1988).

2. CPB raises a second issue, arguing that the Bankruptcy Court effectively denied its claim for interest under 11 U.S.C. § 506(b) because the court stated that the "claim in this case shall be restricted to a maximum amount of $36,000 . . . ." 72 B.R. at 651. As the District Court observed, the Bankruptcy Court explicitly made

## I. Facts

The relevant facts are not in dispute. The Vauses entered into a lease agreement with CPB to rent 420 acres of farm land and attendant buildings for the time period April 1, 1982 through December 31, 1987. The total rent obligation of $201,000 was payable in an initial installment of $21,000 on December 1, 1982, and thereafter in annual installments of $36,000 payable on December 1st of each year through 1987. As is typical in many farm leases, each rent payment was payable in arrears to allow the farmers to first harvest and sell their crops. As the District Court explained, "a farm lease is unique in that the lessee is permitted to occupy and make use of the land but not pay for such use until the *end* of occupancy." 105 B.R. at 400–01 (emphasis in original). *See also* 72 B.R. at 648.

The Vauses harvested and sold their crops for the 1985 season. On November 27, 1985, four days before they were to make their annual rent payment, they filed a joint Chapter 11 bankruptcy petition, and concurrently filed a petition to reject their farm lease with CPB. The Bankruptcy Court approved this rejection on January 14, 1986. The debtors abandoned the leased property in December 1985, subsequent to their bankruptcy filing.

CPB filed a proof of claim for damages arising from the lease rejection in the amount of $72,000. *See* 11 U.S.C. § 501(a). The two-part claim asserted past damages of $36,000 for 361 days' rent unpaid on the petition-filing date, 11 U.S.C. § 502(b)(6)(B), and future damages of $36,000 for one year's loss of future rent, the maximum allowed under 11 U.S.C. § 502(b)(6)(A). The debtors objected to ·the past damages

"[n]o ruling . . . at this time on the actual amount allowable to CPB for [the future damages] portion of its claim *or upon the issue of CPB's entitlement to interest.*" *Id.* (emphasis added). While we conclude that the future damages claim is effectively final, *see* Part II *infra*, no such conclusion can be drawn on the interest issue. We therefore AFFIRM the District Court's holding that the issue was not appropriately on appeal.

part of the claim,[3] arguing that there was no unpaid rent "due under [the] lease" because their obligation did not become "due and payable" under the specific terms of CPB's lease until four days after the bankruptcy filing date. Therefore, the Vauses contended, the claim exceeded the ceiling established under 11 U.S.C. § 502(b)(6)(B).

Accepting the Vauses' argument, the Bankruptcy Court found that, "the language of § 502(b)(6)(B) is unambiguous and specific in its meaning." 72 B.R. at 651. The District Court agreed with the Bankruptcy Court that,

section 502(b)(6)(B) is unambiguous and specific in its meaning, that the determinative date in the case was the filing date, and that there was no unpaid rent due under the Lease on the date of [debtors'] bankruptcy filing. In making these determinations, [the Bankruptcy Court] considered the applicable statutory language, the lack of specific legislative history indicating an expansive or unusual meaning for the statutory language, the usual connotations of the terms "due" and "accrued," the explicit provisions of the Lease, and the absence of reported cases favorable to [CPB's] position.

105 B.R. at 401.

## II. Jurisdiction

Before addressing the merits of the District Court's disposition of this case, we are obligated to determine *sua sponte* whether we are presented with a final order on appeal. *See Bowers v. Connecticut Nat'l Bank,* 847 F.2d 1019, 1022 (2d Cir.1988); *In re Exennium, Inc.,* 715 F.2d 1401, 1402 (9th Cir.1983). This Court's jurisdiction is confined to "appeals from all *final* decisions, judgments, orders, and decrees" of district courts sitting in review of bankruptcy courts. 28 U.S.C. § 158(d) (emphasis added). Although the Bankruptcy Court explicitly reserved ruling on the claim for future damages, *see* note 2, *supra,* the District Court nevertheless concluded that the Bankruptcy Court's order

was final under 28 U.S.C. § 158(a), "because the order conclusively determines a separable dispute over a creditor's claim. The ruling conclusively determined that appellant was not entitled to his separable claim of unpaid prepetition rent in the amount of $36,000. Accordingly, the matter is properly before this Court." 105 B.R. at 401.

■ The finality of the order, however, is put in doubt because CPB presented a *single,* two-part claim under 11 U.S.C. § 502(b)(6) for damages it suffered from the lease rejection. The claim sought past damages (pre-petition rent) under subsection 502(b)(6)(B), and future damages (the upcoming year's rent) under subsection 502(b)(6)(A). Only the past damages part of the two-part claim for past and future damages was ruled on by the Bankruptcy Court. The Seventh Circuit has explained that, "Finality of the order comes from the fact that it resolves *all* of [the creditor's] claims against the estate." *In re Morse Elec. Co.,* 805 F.2d 262, 265 (7th Cir.1986) (emphasis in original). The mere fact that a dispute is "separable" does not automatically make it a final appealable order. The order sought to be appealed "must constitute final determination of the rights of the parties to secure the relief they seek in this suit." *In re Texas Extrusion Corp.,* 844 F.2d 1142, 1155 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988).

■ We nevertheless conclude that the future damages half of the claim is effectively final, and that this Court therefore has jurisdiction to decide the appeal on its merits. The parties informed the Court during oral argument that the debtors have never objected to CPB's future damages claim, and that the claim is currently a part of the debtors' reorganization plan. "A claim ... is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). Although the Bankruptcy Code does not place a time limit on objecting to a claim, it is doubtful that the debtors could raise such an objection at this late date. In

---

**3.** *See* 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects.").

addition, there is no question of whether CPB might mitigate its future damages claim, since CPB was unable to rent the property during 1986. Finally, there is no bankruptcy procedure available to appellants to secure a ruling on an unobjected-to claim.

Our conclusion on jurisdiction is strengthened because courts may decide the merits in cases of "marginal" finality under the Supreme Court's *Gillespie* doctrine. *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964). In certain close cases where finality cannot be conclusively resolved, the "danger of denying justice by delay" outweighs "the inconvenience and costs of piecemeal review," particularly when the questions on appeal are "fundamental to the further outcome of the case." *Id.* at 152–54, 85 S.Ct. at 310–12. "The *Gillespie* doctrine, therefore, permits the courts of appeals to decide the merits in cases of marginal finality where the course of litigation would be impeded, rather than advanced, by dismissing the appeal." *In re Exennium*, 715 F.2d at 1402–03 (citations omitted).

In this case, the Bankruptcy Court decided the past damages part of the claim over two-and-one-half years ago, and the future damages part of the claim has been decided *de facto* through its participation without objection in debtors' reorganization plan. To dismiss the litigation now would impede rather than advance the litigation because the past-damages claim will be a fundamental component of the reorganization plan, affecting not only CPB's rights, but also those of other creditors and the Vauses. Moreover, effective finality of the future damages issue minimizes the prospect of piecemeal review.[4]

### III. The Merits

#### A. Standard of Review

■ Because this Court has jurisdiction, we must decide the proper interpretation of "any unpaid rent due under such lease" under section 502(b)(6)(B). Statutory inter-

pretation is a question of law which this Court reviews *de novo*. *In re Southwest Aircraft Servs., Inc.*, 831 F.2d 848, 849 (9th Cir.1987). *See In re Caldwell*, 851 F.2d 852, 857 (6th Cir.1988). The objective of statutory construction is to "ascertain the intent of Congress." 831 F.2d at 849 (citing *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975)).

#### B. Statutory Language/Plain Meaning

The starting point in determining legislative intent is the language of the statute itself. *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *Watt v. Alaska*, 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). The language of section 502(b)(6) provides:

§ 502. Allowance of claims or interests

. . . .

(b) Except as provided ..., if [a party's] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and *shall allow such claim in such amount, except to the extent that—*

. . . .

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, *such claim exceeds—*

(A) *the rent reserved by such lease, without acceleration, for the greater of one year*, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; *plus*

(B) *any unpaid rent due under such lease*, without acceleration, on the earlier of such dates; . . . .

11 U.S.C. § 502(b)(6) (emphasis added).

■ Section 502(b)(6) is not difficult to apply when a lease does not make rent

---

**4.** We are not unmindful of the narrow scope the Supreme Court has given to the *Gillespie* doctrine. *See Coopers & Lybrand v. Livesay*, 437

U.S. 463, 477 n. 30, 98 S.Ct. 2454, 2462, n. 30, 57 L.Ed.2d 351 (1978).

payable in arrears. It limits a lessor's claim to actual past damages for unpaid rent *due* under the lease (the meaning of which is the subject of this appeal), § 502(b)(6)(B), plus a *maximum* of one year or 15% (not to exceed three years) for the loss of future rent. § 502(b)(6)(A).[5] The problem arises when lease payments are payable in arrears. The term "due" in "any unpaid rent due under such lease" is not defined in the Bankruptcy Code, and has two possible meanings. "It is sometimes used to express the mere state of indebtment, and then is an equivalent to owed, or owing; and it is sometimes used to express the fact that the debt has become payable." *United States v. State Bank of North Carolina*, 31 U.S. (6 Pet.) 29, 36, 8 L.Ed. 308 (1832). The question then is whether Congress intended to give lessors damages for unpaid rent "owing" under the lease, or matured and "payable" under the lease.

The lower courts accepted the Vauses' interpretation, holding that the pre-petition rent was not "due" at the time of the bankruptcy filing because the debtors had no obligation to pay until four days after the filing. This conclusion is based on a "plain meaning" analysis which compares the words "due" and "accrued" in *Black's Law Dictionary* (noting a dearth of legislative history), examines the specific lease terms (since section 502(b)(6)(B) specifies "unpaid rent due *under such lease* "), and distinguishes existing case law (in a

clear case of first impression). After examining the three pillars of the lower courts' statutory construction, we conclude that their "plain meaning" analysis places too much weight on a word which is inherently ambiguous,[6] particularly in light of the legislative history discussed in Part III.C., *infra,* and leads to an inequitable result that Congress could not have intended.

The first pillar of the lower courts' analysis is the comparison of the words "due" and "accrued." In its search for congressional intent, the Bankruptcy Court first noted that the wording proposed for section 502(b)(6)(B) was changed from its original formulation in 1973 as "unpaid rent ... *accrued* up to such date," [7] to the final version enacted in the 1978 Bankruptcy Reform Act of "unpaid rent ... *due* under such lease." [8] After explaining that, "[t]he purpose for the change in language ... does not appear in the legislative history," 72 B.R. at 650, the court then engaged in the following comparison:

> According to *Black's Law Dictionary* 19 (5th ed. 1979), "accrued" signifies "due and payable," "matured," or "vested"; a cause of action "accrues" only when a suit may be maintained thereon. Similarly, "due" signifies "payable," "owed," or "a settled obligation or liability." Although ambiguity may exist as to the time for payment of an obligation which is "due," without qualifying expressions, "due" is restricted to a debt presently

---

5. The "earlier of such dates" under § 502(b)(6)(A), as properly found by the Bankruptcy Court, was the petition filing date of November 27, 1985, § 502(b)(6)(A)(i), since the Vauses did not abandon the property until December 1985, § 502(b)(6)(A)(ii). The parties agree (with the exception of the interest issue discussed in note 2, *supra* ) that CPB's claim for future rent in this case is limited to a maximum of one year's rent, *i.e.,* $36,000.

6. If the word "due" was *not* ambiguous, this case would require analysis under the Supreme Court's *Holy Trinity* doctrine, which allows the Court to look behind the "plain meaning" of a statute when a literal reading would produce "absurd" results clearly unintended by Congress. *See Church of the Holy Trinity v. United States,* 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). *See also Public Citizen v. Department of Justice,*

— U.S. —, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989); *Green v. Bock Laundry Mach. Co.,* — U.S. —, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989) (literal reading of statute would "compel an odd result").

7. § 4–403(b)(6)(B), *The Report of the Commission on the Bankruptcy Laws of the United States* ("1973 Commission Report"), H.R. Doc. No. 93–137, 93rd Cong., 1st Sess. 100 (1973), *reprinted in* Collier on Bankruptcy, Appendix Vol. 2 (15th ed. 1989). *See* 72 B.R. at 649. The use of the term "accrued" is also found in § 502(b)(6)(B)'s predecessor provisions. See § 63a9, Bankruptcy Codes of 1933 and 1934, *reprinted in* 3A Collier on Bankruptcy (14th ed. 1988 supp.), at 927.

8. *See* 72 B.R. at 649 & nn. 2–11.

matured and enforceable. *Black's Law Dictionary* 448 (5th ed. 1979). If "unpaid rent" is interpreted as a qualifying expression for "due under such lease" in § 502(b)(6)(B), that qualifier is most meaningful if interpreted as "payable but not paid." That qualifier, therefore, strengthens the argument that "due" includes "due and payable."

72 B.R. at 650.

The Bankruptcy Court's analysis would generally be correct if we were forced to rely solely on the definitions in *Black's Law Dictionary*. However, as Judge Learned Hand has written, although "words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing," nevertheless, "it is one of the surest indexes of a mature and developed jurisprudence *not to make a fortress out of the dictionary;* but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.) (emphasis added), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). *See Public Citizen*, 109 S.Ct. at 2566 (citing *Cabell*).[9]

Reliance on a comparison of the definitions of "due" and "accrued" in *Black's* neglects that

> [Due] has many definitions, or a variety of meanings, ... *no general rule of interpretation can be safely stated therefrom*. It may, on the one hand, express the mere fact, or the state, of indebtment, as an equivalent simply of "owing;" or, on the other hand, it may refer to the time of payment, indicating that the obligation is immediately enforce-

able.... It has been said that there is a practical, if not a theoretical, unanimity of judicial opinion in giving to the word this double meaning.

28 *C.J.S. Due* 72 (1941) (emphasis added) (footnote omitted). *See also State Bank of North Carolina*, 31 U.S. (6 Pet.) at 36. *Cf. Rumely v. United States*, 293 F. 532, 549 (2d Cir.), *cert. denied*, 263 U.S. 713, 44 S.Ct. 38, 68 L.Ed. 520 (1923) (emphasis added) (making an opposite presumption from that of *Black's Law Dictionary*, stating, "The word 'due' is sometimes used to express the idea of the maturity of the debt. This is to use the word in its *secondary meaning* .... It is evident 'due' and 'owed' have been used as equivalents."). One piece of sound advice in *Black's Law Dictionary* that we do accept is that, "there is considerable ambiguity in the use of the term ['due'], the precise signification being determined in each case *from the context*." *Black's Law Dictionary* 448 (5th ed. 1979) (emphasis added). The context in this case does not lend itself to a "plain meaning" analysis.

We should note, however, that our ultimate conclusion that Congress used the term "due" in the sense of "owing" is supported—when the legislative history is taken into account—by the statutory language when read *in relevant context*. Although the lower courts concentrated exhaustively on the statutory language of subsection 502(b)(6)(B), the language of subsections 502(b)(6)(B) and 502(b)(6)(A) must be read *in pari materia*. "[S]tatutory language is to be read in pertinent context rather than in isolation." *Oates v. Oates*, 866 F.2d 203, 206 (6th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3163, 104 L.Ed.2d 1025 (1989) (citing N. Singer, Suth-

---

**9.** These sentiments are echoed by Justice Brennan, who has said that, "while the starting point in interpreting statutes ... is always the plain words themselves, '[t]he particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense they intended to be understood or what understanding they convey when used in the particular act.'" *Marek v. Chesny*, 473 U.S. 1, 16 & n. 5, 105 S.Ct. 3012, 3020, 87 L.Ed.2d 1 (1985) (Brennan, J., dissenting) (citing 2A C. Sands, Sutherland on Statutory Construction § 46.07,

p. 110 (4th ed. 1984)). *See also United States v. Brown*, 333 U.S. 18, 25–26, 68 S.Ct. 376, 379–80, 92 L.Ed. 442 (1948) (emphasis added) (cited in 473 U.S. at 16 n. 5, 105 S.Ct. at 3020 n. 5) ("The canon of strict construction is not an inexorable command to override common sense and evident statutory purpose. It does not require magnified emphasis upon a *single ambiguous word* in order to give it a meaning contradictory to the fair import of the whole remaining language.").

erland Stat. Const. § 47.02, at 119 (4th ed. 1984)). The two subsections read together support inferring a congressional scheme to provide the lessor with his actual damages for *past* rent, and placing a limit on his damages for speculative *future* rent payments in long-term leases. We will examine how the legislative history supports such an interpretation in Part III.C., *infra.*

The second pillar of the Bankruptcy Court's analysis examines the specific CPB lease terms. The District Court concluded that the lease terms control because "the critical terminology in section 502(b)(6)(B) is 'due *under such lease.*' " 105 B.R. at 402 (emphasis in original). The lower courts suggested that a different result would obtain if the lease had contained language requiring proration or accrual of rent for days of occupancy, or making rent due on one date and payable on a different date.

Were we to agree that section 502(b)(6)(B) requires courts to look to the specific terms of each lease, the lower courts' conclusion that the payments were not "due and payable" under the lease until December 1, 1985, is absolutely correct.[10] Naturally, a fundamental rule of statutory construction is to " 'construe the language of a statute so as to avoid making any word meaningless or superfluous.' " *Oates,* 866 F.2d at 206 (quoting *Fulps v. Springfield, Tenn.,* 715 F.2d 1088, 1093 (6th Cir.1983)). It is equally plausible, however, without straining the statutory language, to read the term "due under such lease" either as *"matured and payable* under such lease," or as *"owing* under such lease." Under the former reading, the court must look to the lease terms for the maturity date; under the latter reading, it is not necessary. Again, a "plain meaning" analysis is not instructive.

We agree with the lower courts on the final pillar of their plain meaning analysis that the existing case law is distinguishable. *See* 72 B.R. at 650–51; 105 B.R. at 401. We should point out, however, that although one case in particular, *Oldden v. Tonto Realty Corp.,* 143 F.2d 916 (2d Cir. 1944), may not decide the precise issue in the present case, it is nevertheless extremely instructive in explaining Congress' legislative intent regarding the concept of a "limited sacrifice" on the part of lessors, 143 F.2d at 920; Congress cited *Oldden* with approval in the 1978 Act's legislative history.

### C. Legislative History

■ Because the language of section 502(b)(6)(B) is unclear, we must turn to the legislative history for guidance. *See Blum,* 465 U.S. at 896, 104 S.Ct. at 1547.[11] While we agree that little legislative history exists on section 502(b)(6)(B), *see* 72 B.R. at 649–50, we find critical the language in the *Report of the Committee on the Judiciary,*[12] which states that,

> Paragraph (7)[13], derived from current law, limits the damages allowable to a landlord of the debtor. The history of this provision is set out at length in *Oldden v. Tonto Realty Co.,* 143 F.2d 916 (2d Cir.1944). It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate.

*Id.* at 353 (footnote added). *See also 1973 Commission Report, supra* note 7, at 106 (clause (b)(6) "codifies the decision in *Oldden* "); Weintraub, Bankruptcy Law Manual ¶ 5.05[2].[14] Thus, Congress intended to

---

**10.** *See* 72 B.R. at 650; and 105 B.R. at 402–03, which set out the lease terms.

**11.** Even when the statutory language appears plain, the legislative history must nevertheless be examined to ascertain congressional intent. *See United States v. Stauffer Chemical Co.,* 684 F.2d 1174, 1183 (6th Cir.1982), *aff'd,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984).

**12.** H.R.Rep. No. 595, 95th Cong., 1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, pp.

5787, 6309, *reprinted in* Collier on Bankruptcy, Appendix Vol. 2 (15th ed. 1989).

**13.** Subsection 502(b)(7) was redesignated as subsection (b)(6), without changing the substantive provision, by The Bankruptcy Amendments & Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333.

**14.** The Weintraub treatise explains,
> The Code limits the allowability of a landlord's claim for damages resulting from

compensate landlords for their *actual damages* while placing a limit on large future, speculative damages which would displace other creditors' claims. Congress' limitation of future rent was a "statutory solution [that] represented a happy medium and imposed on the creditors a *limited sacrifice* in order to achieve the desirable end of facilitating the debtor's rehabilitation by extending the scope of his discharge." 3A Collier on Bankruptcy (14th ed. 1988 Supp.) at 1931 (emphasis added). This concept of a "limited sacrifice" was quoted in *Oldden*, 143 F.2d at 920. In providing for a "limited sacrifice" of future-damages claims for long-term leases, it is likely that Congress made the same assumption as the *Oldden* court that the lessor "has been compensated up until the date of the bankruptcy petition." *Id.*

Our conclusion that Congress has assumed that lessors are compensated for past actual damages is rooted in the evolution of section 502(b)(6), whose genesis predates the 1978 Act and the 1973 Commission Report by over one hundred years. To fully understand Congress' intent to strike a balance between "compensat[ing] the landlord for his loss" together with a "limited sacrifice" to protect other creditors and the debtor's rehabilitation, we must review the predecessor provisions of subsection 502(b)(6), which are thoroughly discussed in 3A Collier on Bankruptcy (14th ed. 1988 Supp.).

The Bankruptcy Act of 1867, 14 Stat. 517, provided that,

Where the bankrupt is liable to pay rent or other debt falling due at fixed and stated periods, the creditor may prove for a proportionate part thereof up to the time of the bankruptcy, *as if the same grew due from day to day, and not at such fixed and stated periods. Id.* at § 19 (emphasis added), *reprinted in* Collier on Bankruptcy, Appendix Vol. 10 at 1758 (14th ed. 1978). In the 1867 Act, Congress thus provided for past actual damages without requiring reference to the specific due dates in a lease. Section 19 did not provide for losses from future rent, and until the 1930s the courts almost unanimously held that rent accruing after the inception of bankruptcy was not provable. 3A Collier at 1927 & n. 4 (citing cases); *Oldden*, 143 F.2d at 918 (citing cases).

The Act of 1898 did not expressly provide a provision on rent,[15] and the courts took the restrictive view that the landlord had no claim "until the due date [specified in the lease] for payment." *Id. E.g., In re Roth & Appel,* 181 F. 667 (2d Cir.1910). Collier refers to this view as a "remnant of medieval theory," *id.,* and such a view is precisely the holding of the lower courts in the present case. The "era of a more rational treatment of claims founded upon leases," *id.,* arrived with the Acts of 1933 and 1934, in which Congress provided for "claim[s] for future rent." *Id.* Section 63a9, section 502(b)(6)'s predecessor, provided for up to one year's future rent, "plus an amount equal to the unpaid rent accrued, without acceleration, up to such date." [16]

In sum, section 502(b)(6) has evolved. In the beginning, Congress compensated lessors solely for their past damages. Then, after Congress omitted a specific provision for lessors, the courts imposed a retrench-

---

breach or termination of a lease. Congress is concerned about landlords with long-term leases submitting huge claims for unpaid rent which accrues in the future. If a landlord on a twenty-year lease, for example, had the right to recover damages for unpaid rent for the remainder of the lease, say sixteen years, the landlord would receive a substantial portion of the estate at the expense of the creditors. B. Weintraub & A. Resnick, Bankruptcy Law Manual ¶ 5.05[2] (2d ed. 1985) (footnote omitted).

**15.** The general provision on provability of debts provided:

Sec. 63. Debts Which May Be Proved.—a. Debts of the bankrupt which may be proved and allowed against his estate which are (1) a fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition against him, whether then payable or not. . . . Bankruptcy Act of 1898, July 1, 1898, c. 541, 30 Stat. 562.

**16.** Bankruptcy Act of March 3, 1933, c. 204, 47 Stat. 1467; Bankruptcy Act of June 7, 1934, c. 424, 48 Stat. 911.

ment, holding even past damages claims to be unprovable until matured and payable under specific lease terms. In the face of a "remnant of medieval theory," Congress next *expanded* lessors' rights, providing for a *limited sacrifice* of past actual damages and limited future damages, in an effort to "compensate the landlord for his loss" while balancing the rights of other creditors and the debtor. The lower courts' interpretation of the section in a way which eliminates past damages based on the fortuity of the filing date does not comport with the balance Congress has attempted to strike between the affected parties.

### D. Equitable Considerations

Finally, equitable considerations require interpreting "due" in the sense of "owing" in order to prevent the debtors, who had the use of CPB's land for 361 days, from receiving a windfall based on the fortuity of the filing date. The lower courts themselves acknowledged the inequities. The District Court stated that, although it "agree[d] with appellant that such a result may seem inequitable, such a matter is for Congress, not this Court, to correct." 105 B.R. at 403. *See also* 72 B.R. at 651 ("Although § 502(b)(6) either intentionally or inadvertently fails to address the apparent inequities resulting from the provisions of a lease rental covenant which is payable in arrears, ... without legislative history or appropriate case law, the [Bankruptcy] Court will not find that such omission was unintentional.").

We would agree with the lower courts' refusal to enlarge the statute if subsection 502(b)(6)(B) were susceptible only to the lower courts' interpretation.[17] However, "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982). The potential for untenable distinctions and unreasonable results is readily apparent in ·

this case. Under the debtors' theory, if CPB had re-rented the property for the upcoming year, or if 1985 were the final year of the lease, CPB would have been entitled to absolutely nothing. In contrast, a less accommodating lessor who had drafted its lease to require up-front payments would receive its full past damages. Likewise, a lessor with a lease which was more cleverly drafted to require proration or accrual of rent for days of occupancy, or making rent due on one date and payable on a different date, would also receive full past damages.

Such a reading of the statute ignores a fundamental tenet of the Bankruptcy Code requiring equal treatment of similarly situated creditors. *See, e.g., Sumy v. Schlossberg,* 777 F.2d 921, 932 (4th Cir.1985); *In re Brints Cotton Marketing, Inc.,* 737 F.2d 1338, 1342 (5th Cir.1984). The structure of the statutory language when read *in pari materia* and in conjunction with the legislative history allows a reasonable interpretation in this case which "strikes the balance between creditor protection and debtor relief that Congress intended, and is eminently reasonable, fair, and sensible." *In re Southwest Aircraft Servs., Inc.,* 831 F.2d at 853.

### IV. Conclusion

For the reasons stated above, we REVERSE and REMAND the pre-petition rent issue to the District Court to in turn remand this case to the Bankruptcy Court for further proceedings consistent with this opinion. We AFFIRM the District Court's holding that the issue of CPB's right to interest was not properly before the Court on appeal.

---

**17.** It "transcends the judicial function" to enlarge a statute to supply omissions which the Court may feel were inadvertently omitted by Congress. *See, e.g., Wolf Creek Collieries v. Rob-* inson, 872 F.2d 1264, 1269 (6th Cir.1989) (quoting *Iselin v. United States,* 270 U.S. 245, 251, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926)).