**In re AMES DEPARTMENT STORES, INC., Eastern Retailers Service Corporation, et al., Debtors.**

**Reorganization Nos. 90 B 11233 (JAG)—90 B 11285 (JAG).**

United States Bankruptcy Court, S.D. New York.

Jan. 31, 1992.

Mark Chinitz, Summit, Solomon & Feldesman, New York City, for movant, Roebling of NY, Inc.

Michael Cook and Edward J. Meehan, Skadden, Arps, Slate, Meagher & Flom, New York City, for debtors.

MEMORANDUM OF DECISION

JAMES A. GOODMAN, Bankruptcy Judge.

On April 25, 1990, Ames Department Stores, Inc., together with its fifty-two af-

filiates ("Debtors"), filed a petition for reorganization pursuant to 11 U.S.C. Chapter 11. The Debtors are currently managing their businesses as debtors-in-possession and many operate in leased store space. This matter is before the court upon two motions by Roebling of New York, Inc. ("Landlord")[1] for orders directing the Debtors to make post-petition lease payments. These companion motions pertain to independent leases between the Landlord and two Debtors, but present similar factual and legal issues.

## FACTS

### The Gilstrap Lease

G.C. Murphy Company, a debtor in these proceedings, originally entered into a long-term lease of an anchor store with the Salem Plaza Company in 1981, which was amended by the First Lease Amendment in 1982 (the "Gilstrap lease"). The store is located in the Harold Gilstrap Shopping Center in Salem, Indiana, and the Debtor continues to use this space for its operations.

The Gilstrap lease provides for certain common area maintenance ("CAM") expenses and real estate taxes incurred by the Landlord to be passed through to the Debtor for reimbursement. Article 9 of the lease contains provisions for CAM charges and provides, in pertinent part:

> Provided Landlord is not in default in its obligations hereunder to maintain the common areas, Tenant agrees to contribute its pro rata share of such cost ... On the first day of the first month of each calendar quarter during the term of this Lease, Tenant shall pay monthly estimates of Tenant's proportionate share of such cost which amount shall be jointly estimated by Landlord and Tenant for the first lease year and shall be based thereafter on the actual costs incurred by the Landlord for the previous lease year. The Landlord shall provide Tenant with a report setting forth in reasonable detail the costs of maintaining the common areas within sixty (60) days after the end of the lease year. Landlord shall make demand for the balance of such contribution (if any is due) within sixty (60) days after the end of the lease year.

Real estate taxes are passed through pursuant to Article 6 of the lease, which provides in pertinent part:

> During the term of this Lease, for each full calendar year in which the Shopping Center has been completed and fully assessed and proportionately for any part of a calendar year, Tenant agrees to pay Landlord Tenant's pro rata share of any real estate taxes assessed against the Shopping Center. Such taxes will be paid for the period of Tenant's occupancy regardless of when said taxes are payable.... If at any time Landlord shall be entitled to reimbursement from Tenant on account of real estate taxes for any tax year, Landlord shall make demand for same within one hundred twenty (120) days after the end of such tax year ...

Three requests by the Landlord for reimbursement are at issue under this lease. On July 25, 1990, Landlord issued a bill for $1,847.15 to the Debtor for "First Half 1989 Common Area Maintenance" charges. The parties have agreed that of that amount, $351.96 was incurred prior to the petition date.[2]

The Landlord's second and third requests were for reimbursement of real estate tax-

---

1. For simplicity, this decision will refer to the Movant, Roebling of New York, Inc., as "Landlord" although in fact it is the agent for Salem Plaza Associates, Ltd. and Eccelston Properties, Inc., the two landlords under the respective leases at issue.

2. In an affidavit submitted on the Debtor's behalf, Peggy Olko, Manager–Property Administration of Ames Department Stores, Inc., states that Ames never received the July 25, 1990 CAM expenses bill prior to this Motion and that Ames disputes the calculation of the amount charged therein. The parties have apparently settled their differences with respect to this bill. A subsequently filed stipulation of facts states that "Ames does not dispute the total amount of the July 25, 1990 Bill." Stipulation as to Facts for Motions of Roebling of New York, Inc., p. 2. The stipulation then states that the parties have agreed to divide that bill into pre- and post-petition amounts, and that the Debtor will promptly pay the post-petition portion.

es. On May 9, 1990, a bill for $14,296.35 was issued to the Debtor, covering real estate taxes incurred for the tax period January 1, 1989 through June 30, 1989. The last bill was issued to the Debtor on September 25, 1990 for the same amount. This later bill represented taxes for the period July 1, 1989 through December 31, 1989. The Debtor does not dispute the amounts of either of these tax bills.

*The Quintree Lease*

Zayre Corp., a debtor in these proceedings, entered into a lease (the "Quintree lease") in 1970 whereby Debtor leased an anchor store in the Quintree Shopping Mall in Braintree, Massachusetts for twenty-five years. This lease, as amended, was eventually assigned to Eccelston Properties, Ltd. as landlord.

Similar to the Gilstrap lease, the Quintree lease required the Debtor to reimburse the Landlord for certain CAM charges which were periodically incurred. The relevant section of this lease is as follows:

[Schedule B, p. 6] 11. As partial reimbursement to Landlord of the cost to Landlord of performing the obligations of Landlord set forth in Paragraph 10 [providing for Landlord's common area maintenance responsibility] Tenant agrees to pay to Landlord for each year included with the term of this lease an amount equal to the product of "Tenant's Fraction" ... and the cost to Landlord of performing said obligation during said year ... Said amount shall be payable periodically, but not more frequently than four (4) times in any one year, upon Tenant's receipt of bills from Landlord.... The amount payable by Tenant under this Paragraph 11 shall be deemed additional rent.

The only bill at issue under this lease was delivered to the Debtor on July 18, 1990, and is for reimbursement of CAM charges.[3] The parties have consented to eliminate a small portion of that original amount, leaving a net balance of $29,876.72. The parties have further agreed that $26,651.96 of that net balance was incurred pre-petition.[4]

*Summary of Amounts at Issue*

The following represents the bills which remain at issue, and the appropriate amounts which the parties have stipulated accrued pre-petition.

|  | Amount | Item | Date of Bill |
| --- | --- | --- | --- |
| Gilstrap Lease: | $ 351.96 | CAM | 7/25/90 |
|  | $14,296.35 | Taxes | 5/9/90 |
|  | $14,296.35 | Taxes | 9/25/90 |
| Quintree Lease: | $26,651.96 | CAM | 7/18/90 |
| TOTAL: | $55,596.62 |  |  |

---

3. At the time the Landlord initially brought this motion, there were also two real estate tax bills at issue. However, these disputes have apparently been resolved. The first tax bill was sent to the Debtor on April 3, 1990 and covered taxes incurred from January 1, 1990 through June 30, 1990. The parties have agreed that the portion of the bill relating to taxes up to the petition date is a pre-petition claim. The remainder is to be promptly paid to the Landlord. The second bill was sent on September 19, 1990, representing taxes incurred for the period July 1, 1990 through December 31, 1990. The parties have consented that this obligation is completely post-petition, and again the Debtor is to pay that amount promptly to the Landlord. There remains some conflict regarding whether the pro rata amounts of the two tax bills were properly calculated. The parties have agreed to enter into good faith negotiations to determine this issue. If the parties are able to settle their differences, the Landlord has agreed to refund any amount overpaid by the Debtor. Otherwise, the parties agree that this court will retain jurisdiction over any proceeding brought by the Debtor to enforce its reserved rights to seek recovery of any amount overpaid. See Stipulation as to Facts, at 5–6.

4. The Debtor paid the Landlord the remaining $3,224.76 on September 20, 1990.

## DISCUSSION

Section 365(d)(3) of the Bankruptcy Code provides in part that "[t]he trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." In general, a debtor is given sixty days from the order for relief to either assume or reject an unexpired nonresidential real property lease, unless the court for cause grants additional time. *See* § 365(d)(4). In this case, the deadline has previously been extended by order of the court until plan confirmation.

The issue presented is whether the amounts in question represent obligations which arose post-petition. If so, then § 365(d)(3) mandates their immediate payment by the Debtors. If instead they arose pre-petition, the Debtors would have to cure those arrearages at the time of lease assumption or, if the lease were ultimately rejected, the obligations would be general unsecured claims to be provided for in the plan of reorganization. This is a novel issue for which there is no case law directly on point.[5]

The Landlord contends that these amounts are post-petition obligations because the Debtors are not primarily liable for these CAM and real estate charges, but are only contractually required to reimburse the Landlord for the amounts incurred. Thus, the Landlord reasons that the Debtors' obligations only arose at the time for payment as designated in the contract, which did not occur until after the bankruptcy filing. Consequently, the Landlord believes it is entitled to immediate payment.

This court rejects the Landlord's argument and concludes that these amounts are unmatured, pre-petition obligations. Unquestionably, the charges were incurred prior to the bankruptcy filing. Furthermore, the language of the lease, which details the Debtors' underlying obligations and then specifies the *timing* of the actual reimbursement, is clear. It is this time for payment, not the obligation itself, which arose post-petition.

The Bankruptcy Code envisions this possibility of an unmatured obligation. Section 101(4)(A) defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, *matured, unmatured,* disputed, undisputed, legal, equitable, secured, or unsecured...." (emphasis added).

The Landlord takes the position that the analogy to § 101(4) and the use of the term "claim" is unjustified. It is unclear to this court why Congress preferred to use the word "obligation" in § 365(d)(3) rather than the broadly defined word "claim." The Congressional Record sets forth the section's general policy, but fails to clarify the meaning of the particular phrase which is at issue in this matter.[6] Nevertheless, the

---

5. A recently decided case, *In re Defender Drug Stores, Inc.*, 127 B.R. 225 (9th Cir.BAP 1991), discussed this very issue in an appellate context. The appellate panel dismissed the appeal due to events subsequent to the bankruptcy court's decision, which rendered some of the appellate issues moot and the remaining issues premature.

6. The relevant part of the Congressional Record quoted by the Landlord in its memorandum reads: "The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease." 130 Cong.Rec. 8895 (daily ed. June 24, 1984) (Statement of Sen. Hatch). However, the Landlord fails to note two distinguishing factors. First, "these problems" cited in the quoted language refer to the "problem ... that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease." *Id.* This is not the situation with which we are faced. Second, and more importantly, the quoted language simply refers to "all the obligations of the debtor." As enacted, however, the statute does not require the immediate payment of *all* the debtor's obligations but rather only those which "arose from and after the order for relief." § 365(d)(3). Thus, interpreting the legislative intent is a futile exercise of limited value in this situation.

meaning is not relevant here. It is undisputed that these charges are "obligations" of the debtor. What is challenged is precisely when the obligations arose, and therefore whether or not they are subject to § 365(d)(3). As discussed above, this court finds that the charges arose pre-petition. Therefore, the Motions by Roebling of New York, Inc. for Orders Under Sections 365(d)(3), 503(a) and 503(b)(1)(A) of the Bankruptcy Code Directing Debtors to Make Postpetition Lease Payments are hereby denied.

The foregoing constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

An appropriate order shall issue.