In the Matter of F & M DISTRIBUTORS, INC., Debtor.

Bankruptcy No. 94–52115–S.

United States Bankruptcy Court, E.D. Michigan, Southern Division.

May 4, 1995.

Lindahl & Gross, P.C., Stephen M. Gross, and Willard E. Hawley, Bingham Farms, MI, Goodrich & Daffada, James V. Daffada, Chicago, IL, for Butera Finer Foods, Inc.

**OPINION GRANTING BUTERA FINER FOODS, INC.'S MOTION TO COMPEL F & M DISTRIBUTORS, INC. TO PAY REAL PROPERTY TAXES ACCRUED PRE–PETITION BUT PAYABLE POST–PETITION UNDER CERTAIN UNEXPIRED LEASES OF NON–RESIDENTIAL REAL PROPERTY**

WALTER SHAPERO, Bankruptcy Judge.

*Background and Facts*

Butera Finer Foods, Inc. ("Butera" or "Landlord") leases space in strip shopping centers located in the Chicago area to three F & M stores. Landlord and F & M ("Debtor") are parties to the following lease agreements:

(1) Lease Agreement dated March 1, 1987 for 4343 North Kedzie, Chicago, IL (the "Kedzie Lease");

(2) Sublease Agreement dated May 15, 1987 for 3046 North Halstead, Chicago, IL (the "Halsted Sublease"); and

(3) Lease Agreement dated June 26, 1987 for 4140 West Diversey, Chicago, IL (the "Diversey Lease").

Collectively all three leases are known as the Leases.

Paragraph 4.A. of the Kedzie Lease and the Diversey Lease provide that:

Tenant shall pay and discharge before delinquent all Real Estate Taxes (as hereinafter defined) which become due during the term of this Lease. Real Estate Taxes shall mean all real estate taxes and assessments, extraordinary as well as ordinary,

levied or assessed by any lawful taxing authority upon the Demised Premises.[1]

Paragraph 4 of the Halstead Sublease requires Debtor to pay real property taxes as required to be paid by Landlord under a certain Operating and Sublease Agreement dated October 1, 1982 between Landlord and Scot Lad Foods, Inc., which in turn requires Landlord to perform all obligations under a certain Lease Agreement, dated July 5, 1973, between Amalgamated Trust & Savings Bank and National Tea Co., as amended (the "Prime Lease"). Landlord states in its brief that paragraph 17 of the Prime Lease provides that:

> [Butera] further agrees to pay as additional rent for the demised premises, all real estate taxes and assessments ... which may be levied, assessed or imposed upon the demised premises ...

Debtor does not appear to dispute this. While that quoted language does not say *when* such taxes are to be paid, this Court is assuming that the parties agree that the "when" is similar to, or the same as, what the above-quoted language relating to the Kedzie and Diversey leases provides.

In Illinois, real property taxes are, as this Court understands it, assessed on a calendar year basis but are not billed until the following year. Judging from the Illinois tax bills involved, the amounts billed as due and payable on March 1, 1995 are approximately one-half of the 1994 taxes calculated as one-half of the taxes actually assessed for the tax calendar year *1993*. In other words, if the total taxes for the tax calendar year 1993 were $15,000, the amount due on March 1, 1995 (as an estimate on the 1994 taxes) is one-half of $15,000, or $7,500. Presumably, between March 1, 1995 and September 1, 1995, the taxing authorities then determine and assess the actual taxes for calendar year 1994 and send a tax bill based thereon due on September 1, 1995, in an amount equal to the total taxes due for 1994, less whatever was

previously paid (presumably the $7,500). After the March 1 due date, statutory penalties of one and one-half percent (1.5%) per month are assessed (apparently in the amount of the delinquent estimated payment) until the taxes are paid. 35 ILCS 205/224.1 et. seq.[2]

For calendar year 1994, the taxes for premises covered by the Leases were billed to the Debtor on March 1, 1995 in the following estimated amounts:

| | |
|---|---|
| Kedzie Lease | $19,534.19 |
| Halstead Lease | 46,050.45 |
| Diversey Lease | 5,590.95 |
| | $71,175.59 |

Landlord anticipates that similar amounts representing the balance of the actual 1994 real estate taxes will be due September 1, 1995.[3]

On February 3, 1995, this Court entered an Order providing for an extension of time until and including September 1, 1995 for Debtor to assume or reject certain executory real estate leases, including the Leases. The Order provides that "... F & M shall continue to comply and perform in accordance with Section 365(d)(3) of the Bankruptcy Code." Debtor asserts that this section (of the tax code) requires only that it pay a prorated portion of 1994 real estate taxes attributable to the period from the Petition Date through December 31, 1994. Landlord, however, maintains that Section 365(d)(3) mandates that Debtor pay the entire amount due on March 1, 1995 because Debtor is obliged under that section to "perform all the obligations of the debtor ... arising from and after the order for relief." Landlord and Debtor agree that the only issue in dispute between the parties is whether section 365(d)(3) of the Bankruptcy Code requires Debtor to now pay as an administrative expense the full amount of the March 1, 1995 estimated tax bill or only the portion which, by proration of the entire tax bill for 1994, covers the period between December 5, 1994 and December 31, 1994 (with the remainder

---

1. This lease also provides for tax prorations at both the commencement and termination of the lease.

2. It should be noted that these tax details are explained only for clarity's sake. Taxes which are assessed and paid on a different basis would

likely not require a different conclusion by this Court, given its rationale.

3. This may not be true depending on what the total 1994 tax bill actually turns out to be.

being considered, and ultimately treated as, a pre-petition claim).[4]

Landlord asserts that, pursuant to the provisions of the three unexpired Leases which require Debtor to pay all real estate taxes and assessments that may be levied against the subject properties, Debtor is obligated to pay the full amount of the disputed taxes as an administrative expense, despite the fact that they cover or, in an accrual or cost accounting sense, are substantially related to a pre-petition period, because such taxes were billed and became payable post-petition under the relevant leases.

Debtor argues that the disputed taxes that relate to the period prior to the commencement date be treated as pre-petition claims that were unmatured as of the Commencement Date and Debtor's tax obligations under the relevant leases should be limited to the prorated portion of the disputed taxes accruing after the commencement date.

### Law and Discussion

■ This Court recognizes that there is a split in the authority concerning the interpretation of § 365(d)(3) with respect to the type of claim a landlord has for rent or taxes which come due subsequent to the filing of a bankruptcy petition but prior to a debtor's assumption or rejection of the lease. A majority of courts seem to have concluded that under § 365(d)(3) rent and taxes, in what may be considered to be analogous situations, should be prorated to cover only the post-petition, pre-rejection period, regardless of the due date.[5] Other courts, however, find that under the *plain language* of § 365(d)(3), a debtor must pay, as an administrative expense, what in this case would be the full amount of the March 1, 1995 tax bill. *See In re R.H. Macy & Co., Inc.*, 152 B.R. 869 (Bankr.S.D.N.Y.1993), *aff'd*, 1994 WL 482948, *12 (S.D.N.Y.); *In re Duckwall–ALCO*

*Stores, Inc.*, 150 B.R. 965, 975 (D.Kan.1993); *In re Appletree Markets, Inc.*, 139 B.R. 417 (Bankr.S.D.Tex.1992).

Section 365(d)(3) states, in pertinent part,

The trustee shall timely perform all the *obligations* of the debtor, except those specified in section 365(b)(2), *arising from and after the order for relief* under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

11 U.S.C. § 365(d)(3)(1994) (emphasis added). This Court finds that Debtor's obligation to pay the March 1, 1995 tax bill did not "arise" pre-petition because there was no obligation for Debtor to pay this bill prior to the petition date. Because, in this case, the obligation arose post-petition (when the tax payment became due) Debtor must pay taxes due after the filing of the bankruptcy and prior to the assumption or the rejection of the lease.

Debtor, however, equates the term "obligation" with the term "claim". Debtor argues that the correlative relationship of the terms "claim" and "obligation" was recognized by Congress and reflected in the legislative history of section 101(5):

The legislative history of § 101(5) (originally enacted as § 101(4)) indicates that the term "claim" is intended to be defined as broadly as possible so that maximum relief can be afforded to a debtor: "By this broadest possible definition ... [the Code] contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 309 (1977), reprinted in 1977 U.S.C.C.A.N. 5963, 6266. Thus, the argument goes, the

---

4. One assumes that the estimated one-half payment is on account of the whole tax due for all of 1994 and not allocated to the first six months or so of 1994.

5. *In re Child World, Inc.*, 161 B.R. 571, 576 (S.D.N.Y.1993); *In re Ames Department Stores, Inc.*, 150 B.R. 107 (Bankr.S.D.N.Y.1993); *In re RB Furniture, Inc.*, 141 B.R. 706 (Bankr.C.D.Cal. 1992); *In re Ames Department Stores, Inc.*, 136

B.R. 353 (Bankr.S.D.N.Y.1992); *In re Duckwall–Alco Stores, Inc.*, 1992 WL 365326 (D.Kan.1992); *In re Revco D.S., Inc.*, 111 B.R. 626 (Bankr. N.D.Ohio 1989); *In re Swanton Corp.*, 58 B.R. 474 (Bankr.S.D.N.Y.1986); *In re S & F Concession, Inc.*, 55 B.R. 689 (Bankr.E.D.Pa.1985); *In re Barrister of Delaware, Ltd.*, 49 B.R. 446 (Bankr.D.Del.1985).

nature of an obligation under section 365(d)(3) of the Bankruptcy Code must be determined by considering the nature of the claim to which the obligation relates. If a creditor's claim is pre-petition, a debtor's obligation relating to it must also be pre-petition. In determining whether an obligation or claim is pre-petition, the dispositive factor is when the obligation or claim, be it contingent, unliquidated or unmatured arises—not its date of payment. *In re Ames Department Stores, Inc.*, 150 B.R. 107, 108 (Bankr.S.D.N.Y.1993). Therefore, Debtor argues that as of the commencement date, Landlord had an unmatured claim against Debtor with respect to the pre-petition taxes which is a pre-petition claim against the estate.

■ This Court, however, does not find Debtor's argument persuasive. This Court finds, first, that the terms "obligation" and "claim" do not have the same meaning, at least in the context of the issue in this case. Second and more importantly, in one broad sense, the "obligation" to pay the taxes "arose" when the lease *was originally signed,* but that could not be what Congress meant (lest everything required by the lease be considered a pre-petition obligation and the "arising" language is rendered superfluous). The statute's wording is clear enough, at least to this Court, to avoid implications of ambiguity which would then permit resort or reference to other sources or considerations to determine what the statute means. The requirement that the taxes be paid, in the sense used here, both became an "obligation" (if one emphasizes the "obligation" aspect of the statute) on March 1, 1995, the date the lease obligated the Debtor to pay them, and "arose" at the same time. If one emphasizes the term "arose" rather than the term "obligation", one could even concede that the "obligation" may have come into existence when the lease was originally signed, but nevertheless only "arose" on March 1, 1995, i.e. on the tax bill due date, which was the date the lease obligated Debtor to pay the taxes (though the outside date must be the last day payable before delinquency). Third, the *Ames* decision is not consonant with the

plain language of the statute. *Macy's,* 152 B.R. at 873, n. 5.

■ This Court also concludes that, because § 365(d)(3) is unambiguous, this Court must follow its plain language without regard to any equitable or policy considerations. *In re R.H. Macy & Co., Inc.,* 1994 WL 482948, *12 (S.D.N.Y.). The rationale of those cases relied on by the Debtor, and with which this Court disagrees, essentially embodies perfectly reasonable notions of fairness and equity, accrual accounting concepts, and elements of actual or perceived marketplace custom and usage. The problem with such is simply that the statute and the contracts of the parties dictate otherwise with a clarity sufficient to preclude this Court from indulging or imposing what might be its own similar notions. The Court's conclusions also square with concepts that the Leases are property and contracts of the estate (executory to be sure) to which Debtor is bound, subject to rights to assume or reject. For a full discussion of this subject see: Joshua Fruchter, *To Bind or Not to Bind—Bankruptcy § 365(d)(3): Statutory Minefield,* 68 Am.Bankr.L.J. 437 (Fall 1994).

■ The fact that strict reliance upon the March 1 tax bill due date, in the context of the lease provision referring thereto may produce what some describe as an "arbitrary" or "inequitable" result should not require a different conclusion. Even if avoiding "arbitrary" or "inequitable" results may be a consideration, courts should not in effect revise, or refuse to enforce, unambiguous statutes based on such considerations. That is for legislatures. Congress (if it totally appreciated the potential problem)[6] could have used the term "accrual" as would more clearly point the way. It did not. Furthermore, the parties might have achieved a different result by negotiation and contract. They did not. This Court does not see a need or a useful purpose in further analyzing what is meant by plain language.

The National Bank of Detroit ("NBD") also raises the point that application of the statute is not necessarily fair. NBD argues that Landlord's position is untenable because

6. Even if it did not, the language used must still control.

if the Leases were terminated one day prior to the bankruptcy filing, then Landlord would have neither a pre-petition claim for the taxes (because the taxes were not due until March 1, 1995) nor would Landlord have an administrative expense claim for the taxes because the leases were terminated pre-petition. As noted, fairness is not a consideration unless the statute so states, or the statute and the legislative history are so ambiguous or at odds as to permit resort to such considerations. That is not the case here.

Even though this Court finds that the language of § 365(d)(3) is unambiguous and, therefore, there is no need to explore the legislative history, reference to legislative history arguably does afford some support for this Court's reading of § 365(d)(3). During the hearings on this statute, Senator Hatch stated:

> This subtitle contains three major substantive provisions which are intended to remedy serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code ... A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due and landlord and common area charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position ... This bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

130 Cong.Rec. § 889 (June 29, 1984) (statement of Sen. Hatch) reprinted in 1984 U.S.C.C.A.N. 590, 599. Apparently, Senator Hatch anticipated that the trustee would be bound to perform all of the obligations imposed on the debtor by the lease and the terms of the lease would govern when payments were due and for what amount. *See,* Fruchter, 68 Am.Bankr.L.J. at 463–464. (The Court takes particular note of the reference to "pay * * * * on time".)

Debtor argues that the taxes incurred which relate to the use of the property from January 1, 1994 through December 4, 1994 do not constitute an expense attendant to Debtor's current use of the leased property as contemplated by the indicated legislative history when enacting section 365(d)(3), but rather relate to the use of the property that occurred prior to the commencement date of this case. Therefore, the portion of the disputed taxes that relate to the period from January 1, 1994 to December 4, 1994, while payable under the Leases post-petition, bears no relation to current services provided by Landlord to Debtor post-petition. Debtor asserts that, under the circumstances, granting Landlord's request to have Debtor pay the pre-petition taxes pursuant to section 365(d)(3) of the Bankruptcy Code would thus allow the elevation of pre-petition claims to post-petition status.

The answer to that argument is three-fold. First, we are not here dealing with the concept of a "claim". Second, in its wisdom Congress required debtors to keep their non-residential leases current in exchange for time to consider what to do about them and that, in essence, means to this Court that debtors were simply required to follow the lease requirements (and particularly payment obligations) essentially without regard to the filing date. Third, the reference to current services in the legislative history should not be seen as equating the parameters of the obligation to dates or times of the receipt of the benefit of such services. Rather, the reference should be read as merely the basic rationale for the statutory provision, the language of which controls.

For the foregoing reasons, this Court GRANTS Landlord's Motion and requires it

to submit an order consistent with this Opinion.