In re DeCICCO OF MONTVALE, INC., Debtor.

**Bankruptcy No. 99–35448 (NLW).**

United States Bankruptcy Court, D. New Jersey.

Sept. 30, 1999.

Norman S. Rosenbaum, Siller Wilk LLP, New York City, John Eugene, Metuchen, NJ, for debtor and debtor in possession.

Robert L. Ritter, Schiffman, Berger, Abraham, Kaufman & Ritter, PC, Hackensack, NJ, for Grand Union Company.

Wayne M. Greenwald, Greenwald & Rimberg, LLP, New York City, Michael P. Feltman, Sokol, Behot and Fiorenzo, Hackensack, NJ, for Haremak Associates.

## OPINION

NOVALYN L. WINFIELD,
Bankruptcy Judge.

The debtor, DeCicco of Montvale, Inc. ("DeCicco"), seeks an order from this Court that its portion of Common Area Maintenance Charges ("CAM") and real estate taxes and any other additional rent payable as a post-petition lease obligation is limited to the amounts that have accrued since the petition date. DeCicco does not quantify what it believes its present obligation to be.

The Grand Union Company ("Grand Union"), the guarantor of DeCicco's lease obligations, objects to the motion and has cross moved to compel DeCicco to pay $72,821.37 in post-petition taxes and CAM to the landlord, Haremak Associates ("Haremak").

Haremak also objects to DeCicco's motion and supports Grand Union's cross motion. Haremak requests that the Court direct DeCicco to pay it $48,379.07 for taxes and CAM owed. A hearing was held on this matter on August 31, 1999, at which time the Court considered arguments of counsel. At this hearing, Grand Union amended its cross motion because it believes DeCicco actually owes Haremak $90,719.07. Grand Union's counsel advised that he had made a miscalculation when he computed the earlier $72,821.37 figure.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this jurisdiction is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (B). The relief sought, determination of payment of post-petition obligations under a lease of nonresidential real property, is statutorily grounded in § 365 of the Bankruptcy Code. As set forth in greater detail below, the Court finds that DeCicco's obligation to pay CAM and taxes arose in the pre-petition period, and thus, does not constitute a post-petition obligation payable under § 365(d)(3). The following constitutes this Court's findings of fact and conclusions of law made in accordance with Bankruptcy Rule 7052.

## FACTS

DeCicco, a closely held New Jersey corporation, filed for relief under Chapter 11 of title 11, United States Code on May 13,

1999, and has continued in possession of its property and management of its affairs as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. DeCicco is the assignee of a lease, dated May 5, 1970 ("Lease"), of nonresidential real property between Grand Union as tenant and Haremak as landlord. Grand Union assigned its interest in the Lease to DeCicco on September 3, 1997. Prior to filing for bankruptcy, DeCicco operated an upscale supermarket at the premises, located at 137 North Kinderkamack Road, Montvale, New Jersey.

At the time of the bankruptcy filing, litigation was pending in the Superior Court of New Jersey, Bergen County, captioned *DeCicco of Montvale, Inc. and The Grand Union Company v. Haremak Associates*, No. BER–L–6852–98. In that action, DeCicco and Grand Union contended that the Lease expires on April 30, 2012, while Haremak argued that it expires on April 30, 2002. Shortly after commencement of its Chapter 11 case, DeCicco removed the state court litigation to the bankruptcy court. On June 28, 1999, this Court granted Haremak's motion to remand the Lease litigation to the Superior Court of New Jersey, and modified the automatic stay to the extent necessary to permit the state court to determine the duration of the Lease. On July 23, 1999, the Honorable Jonathan N. Harris ruled that the Lease expires on April 30, 2012 and directed Haremak to specifically perform its obligations under the Lease through that date.

Because disposition of DeCicco's leasehold interest during the Chapter 11 could not be resolved until a ruling was made on the duration of the lease, DeCicco requested an extension of its time to assume or reject the lease. Pursuant to an order dated July 12, 1999, this Court granted DeCicco's motion for an order extending the debtor's time to assume or reject its Lease through and including October 12, 1999. Moreover, in order to determine the additional rent DeCicco owes as post-petition obligations, the Court's Order directed Haremak to submit an invoice to DeCicco for the CAM charges, real estate taxes, and any additional rent it contends is due. The Order also directed that within twenty days of the receipt of the invoice, DeCicco make the required payment or file a motion to determine the amount it owes.

The tenant has an obligation to pay its pro rata share of CAM and real estate taxes under paragraphs five and six of the September 30, 1993 Modification Agreement to the May 5, 1970 Lease.

Paragraph five of the Modification Agreement reads in pertinent part:

> Tenant shall pay to Landlord as its contribution towards Landlord's cost of maintaining the common areas a prorata portion of the Landlord's cost of maintaining the common areas of the shopping center. Said prorata share to be determined in the same manner as provided for in Paragraph # 5 hereof, and shall be due and payable **within THIRTY (30) DAYS** after submission by the Landlord to the Tenant of the statement showing the computations upon which Tenant's payment under this paragraph is based, together with photostatic copies of all applicable bills paid by the Landlord.

Modification Agreement, September 30, 1993, para. 5 (emphasis added).

Paragraph six of the Modification Agreement reads in pertinent part:

> The Tenant shall reimburse the Landlord for a prorata portion of the Landlord's annual ad valorem taxes on the shopping center.... The Tenant's obligation pursuant to this paragraph, if any, shall become due and payable **within THIRTY (30) DAYS** after the payment by the Landlord of such ad valorem taxes, upon submission to the Tenant by the Landlord of a verified statement showing the computations upon which the Tenant's payment under this paragraph is based, together with

photostatic copies of all applicable tax bills paid by the Landlord.

*Id.* para. 6 (emphasis added).

A review of these provisions, particularly in the context of the entire Modification Agreement, causes this Court to conclude that these Lease terms were bargained for and are not merely boilerplate. Not only do the provisions of paragraphs five and six modify earlier Lease terms, but other Lease provisions were modified as well. For example, the Modification Agreement increased the base rent and the amount of space leased. Because the Modification Agreement contains language specific to the changes effected by the parties, the Court presumes that they negotiated the terms, and thus will give effect to the intent of the parties to the lease, as reflected by the language which they employed.

On July 14, 1999, DeCicco received a letter from Haremak's counsel setting forth $48,379.07 as DeCicco's share of CAM charges and taxes it owed Haremak. The letter identified the debtor's share of CAM, based on 1998 expenses of $24,-442.30, as totaling $15,643.07. Taxes due were computed as follows:

| February 1, 1999 payment | — | $10,560.00 |
| May 1, 1999 payment | — | $10,560.00 |
| August 1, 1999 payment | — | $11,616.00 |

DeCicco claims that Haremak did not provide it with the necessary supporting documentation for these alleged amounts, as required by the amended Lease. Specifically, the amended Lease requires Haremak to furnish DeCicco with detailed statements and back-up documentation, including all applicable bills, for the CAM and real estate charges. *See id.* paras. 5 & 6.

Both Haremak and Grand Union claim that Haremak provided DeCicco with the appropriate supporting documentation in the form of information that was attached to the April 14, 1999 Certification of Moses Marx, filed on April 16, 1999 in connection with Haremak's earlier motion for partial summary judgment in the State Court.

The documentation attached to the Marx certification consists of various invoices from vendors, tax bills through May, 1999 from the Borough of Montvale, and covers time periods in addition to 1998. Nonetheless, both Haremak and Grand Union have taken the position that the demand for payment contained in the Marx certification and supported by the aforementioned exhibits constitutes the submission of statements of amounts due as required by paragraphs five and six of the Modification Agreement.

There is a discrepancy between Grand Union and Haremak as to how much DeCicco owes Haremak. Haremak, in its July 14, 1999 letter and as of its latest papers filed with the Court (August 25, 1999), claims DeCicco owes it $48,379.07. Grand Union, however, claims DeCicco owes Haremak $72,821.37. Robert Ritter ("Ritter") explains in his certification that the additional $24,442.30 is DeCicco's share of the 1998 taxes.

Ritter broke down the costs as follows:

| (A) | 1998 CAM | $15,643.07 |
| (B) | 1998 Taxes | $24,442.30 |
| (C) | February 1, 1999 Tax Payment | $10,560.00 |
| (D) | May 1, 1999 Tax Payment | $10,560.00 |
| (E) | August 1, 1999 Tax Payment | $11,616.00 |
| Total Post–Petition Obligations | | $72,821.37 |

As noted earlier, Grand Union amended this total at the August 31, 1999 hearing from $72,821.37 to $90,719.07. Subsequently, in a letter to the Court, Ritter explained that the total was amended because he mistakenly inverted two numbers when he added the 1998 taxes to the total post-petition obligations. Specifically, Ritter originally claimed $24,442.30 was owed for the 1998 taxes, but now represents that the actual figure is $42,442.30

## DISCUSSION

Disposition of the issue before the Court requires application of 11 U.S.C. § 365(d)(3) which provides, in pertinent part, that:

The trustee shall timely perform all the obligations of the debtor . . . . arising

from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding § 503(b)(1) of this title.

11 U.S.C. § 365(d)(3).

There are no reported decisions on this issue in this circuit. Case law outside this circuit demonstrates that there is a split of authority in interpreting § 365(d)(3) with respect to the type of claim a landlord has for rent or taxes which come due in the post-petition, pre-rejection period.

DeCicco asks the Court to follow the majority approach, commonly known as the accrual method. Under the accrual method, a debtor's post-petition obligations under a lease of nonresidential real property apply only to those obligations which accrue during the post-petition, pre-rejection period. The date the post-petition obligations are actually due is irrelevant under this method.

Grand Union and Haremak, on the other hand, call for the Court to adopt the billing date approach, which states that a debtor-in-possession leasing nonresidential real property must pay in full all amounts which come due during the post-petition, pre-rejection period, regardless of whether some of those charges accrued pre-petition. Hence, a crucial question under the billing date approach is the date on which the obligations come due.

Before the Court, consequently, is whether a debtor-in-possession leasing nonresidential real property must pay taxes and charges, as required by the lease, to the landlord during the post-petition, pre-rejection period, regardless of whether some of those charges accrued pre-petition. At the heart of the issue is whether the court adopts the billing date approach or the accrual method.

### The Billing Date Approach v. the Accrual Method

■ To understand which method is most appropriate, one must examine the language of the statute. DeCicco argues, and the majority of courts agree, that the language of § 365(d)(3) is ambiguous with respect to when the obligation arises to reimburse a landlord for taxes, CAM and like charges. *See, e.g. National Terminals Corp. v. Handy Andy Home Improvement Centers,* 222 B.R. 149, 153 (N.D.Ill.1997), *aff'd* 144 F.3d 1125, 1128 (7th Cir.1998); *In re McCrory Corp.,* 210 B.R. 934, 939 (S.D.N.Y.1997); *In re All For A Dollar,* 174 B.R. 358, 361–62 (Bankr.D.Mass.1994); *In re Child World,* 161 B.R. 571, 575–76 (S.D.N.Y.1993). Therefore, DeCicco maintains, the Court must turn to the legislative history of the 1984 amendments to the Bankruptcy Code to determine its meaning. The courts following the accrual method have concluded, through an analysis of § 365(d)(3)'s legislative history, that Congress did not intend to overturn the longstanding practice of prorating a debtor tenant's lease obligations to cover merely the post-petition, pre-rejection period. *See In re Child World,* 161 B.R. at 575. For example, after reviewing Senator Hatch's comments, the court in *Child World* concluded that Congress simply intended § 365(d)(3) to protect landlords from becoming involuntary post-petition creditors, and ensure that landlords receive "current payment" for "current services." *See id.* at 575–76.

Haremak and Grand Union, however, argue that the statute is clear on its face, and contains no ambiguity that necessitates resort to legislative history. Courts which adhere to the minority view find that the plain meaning of § 365(d)(3) clearly requires payment of obligations arising after the petition is filed, even though the taxes or other charges accrued during the pre-petition period. *See, e.g. In re Koenig Sporting Goods, Inc.,* 229 B.R. 388, 394 (6th Cir. BAP 1999); *In re F & M Distributors, Inc.,* 197 B.R. 829, 831 (Bankr. E.D.Mich.1995); *In re R.H. Macy & Co.,* 152 B.R. 869, 872–73 (Bankr.S.D.N.Y. 1993), *aff'd* 1994 WL 482948, at *13 (S.D.N.Y.1994); *In re Appletree Markets,*

*Inc.*, 139 B.R. 417, 420 (Bankr.S.D.Tex. 1992).

This Court adopts the billing date approach. First, the Court agrees that § 365(d)(3) is clear on its face. The Court presumes that Congress intended its words to have ordinary meaning. In that vein, the Court agrees with Chief Judge Lifland's analysis in *R.H. Macy*. In that case, the sublessor sought payment from Macy's for reassessed real property taxes that accrued in the pre-petition period, but which did not become obligations of the debtor under the terms of the lease until the post-petition period. The debtor contended that, as of the petition date, the sublessor held a contingent claim for the taxes which became fixed and liquidated when the supplemental tax bill was issued post-petition. *See R.H. Macy*, 152 B.R. at 872. Based on its conclusion that the sublessor held a pre-petition claim, the debtor contended that payment of the taxes was not an obligation for which "timely performance" was required under § 365(d)(3). *See id.*

Applying the plain meaning approach to statutory construction, the court noted that Congress chose to use the word "obligation" rather than "claim" in § 365(d)(3). *See id.* at 873. While Congress certainly knew how to use the word claim, they chose instead to use the word obligation. Applying the rule of statutory construction, which provides that "[c]ourts [should] properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Id.* (quoting *Pioneer Investment Services Co. v. Brunswick Assoc. Limited Partnership*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)) (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)), the *R.H. Macy* court found it improper to equate the terms obligation and claim and "evaluate when an 'obligation' arises under a lease of nonresidential real property by analogy to precedent determining when a

'claim' arises for bankruptcy purposes." *Id.* It noted that the debtor did not become obligated to pay the reassessed taxes until well after the petition date. Accordingly, it held that the reassessed taxes represented an obligation that arose after the order for relief which had to be timely preformed pursuant to § 365(d)(3). *Id.*

The court in *F & M Distributors* followed *R.H. Macy's* analysis and reasoning in evaluating the term "obligation" as used in § 365(d)(3). In *F & M Distributors*, the debtor equated the term "obligation" with the term "claim" for purposes of analyzing § 365(d)(3). The court captured the debtor's argument as follows:

> Thus, the argument goes, the nature of an obligation under section 365(d)(3) of the Bankruptcy . Code must be determined by considering the nature of the claim to which the obligation relates. If a creditor's claim is pre-petition, a debtor's obligation relating to it must also be pre-petition. In determining whether an obligation or claim is pre-petition, the dispositive factor is when the obligation or claim, be it contingent, unliquidated or unmatured arises—not its date of payment (citation omitted). Therefore, Debtor argues that as of the commencement date, Landlord had an unmatured claim against Debtor with respect to the pre-petition taxes which is a pre-petition claim against the estate.

*In re F & M Distributors*, 197 B.R. at 831–32.

The court, however, did not find the debtor's argument, as laid out above, persuasive. *See id.* at 832. It agreed with *R.H. Macy* that the terms "obligation" and "claim" do not have the same meaning within the context of § 365(d)(3). *See id.* Further, the court in *F & M Distributors* found that under a broad reading of the statute, one may argue that the "obligation" to pay the taxes "arose" when the lease was first signed. *See id.* However, as noted by the court, such a construction of the statute would make superfluous the use of the term "arising" in § 365(d)(3),

and this cannot be what Congress meant. *See id.* Ultimately, the court found that § 365(d)(3)'s words are clear enough to avoid creating an ambiguity where none exists, and held that the statute's plain language must be followed, regardless of equitable or policy considerations. *See id.*

Additional support for the conclusion that the language of § 365(d)(3) is unambiguous is found in *In re The Krystal Co.,* 194 B.R. 161 (Bankr.E.D.Tenn.1996). The court in *Krystal* found that inclusion of the phrase "notwithstanding § 503(b)(1) of this title" within § 365(d)(3) precluded treatment of obligations arising after the petition date as administrative claims. *See id.* at 163. The court determined that these prerejection obligations are not to be viewed as administrative expenses, but as obligations to be "timely perform[ed]" under the lease. *See id.* Moreover, since "payment of these obligations is not designed to preserve the estate (but rather the vulnerable landlord), the concepts of accrual, proration and allocation—so necessary for distinguishing between pre-petition debts and administrative expenses in the context of § 503(b)(1)—are irrelevant and inapplicable under § 365(d)(3)." *Id.*

Thus, as is readily demonstrated by the foregoing analysis. the alleged ambiguity in the language of § 365(d)(3) that is advocated by the proponents of the accrual approach only arises by imputing concepts explicitly rejected by the statutory language employed. Given that the statute can be sensibly applied as written, the Court declines to conclude that the drafters intended otherwise.

Furthermore, although there is no need to resort to legislative history, it bears noting that such legislative history as exists is more consistent with the billing date approach than the accrual approach.[1] Again, the thoughtful examination made by the court in *Krystal* is illuminating. The court found it significant that Senator Hatch did not refer to the concepts of accrual or proration. Rather, the court observed that in Senator Hatch's comments:

There is no mention of "actual or necessary" expenses as might be expected if § 503(b)(1) were still operative. There is only the categorical "timely performance requirement" as an antidote to the problems "caused ... by the administration of the bankruptcy code." When read in conjunction with the statute as it must be, this "problem" language can only refer to § 503(b)(1), for that is the subsection specifically overridden by the amendment. Section 503(b)(1)'s essential concepts, accrual and proration, cannot be shown to have survived in § 365(d)(3), where they are unnecessary on a plain reading of the

---

1. No conference report accompanied this legislation. All that is available with regard to this section are the comments of Senator Orin Hatch:

This subtitle contains three major substantive provisions which are intended to remedy serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code. A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor. This bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that the debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

H.R.Conf.Rep. No. 882, 98th Cong., reprinted in 1984 U.S.Code Cong. & Admin.News 576.

statute, and it makes no sense to force them.

*Id.* at 164.

The *Krystal* court reasoned, and this Court agrees that § 365(d)(3) shifted the burden of indecision from the landlord to the debtor, who under the statute must perform the lease obligations or decide to reject the lease before an obligation becomes due. *See id.*

Grand Union also urged the Court to find that the billing date approach is consistent with the Third Circuit's decision in *In re Frenville Co.*, 744 F.2d 332 (3d Cir. 1984). In *Frenville*, creditors filed an involuntary bankruptcy petition against Frenville. Post-petition, certain bank creditors also filed an action against Frenville's accountants alleging negligent and reckless financial statement preparation. As a result, the accounting firm filed a motion for relief from the automatic stay in order to assert a third party claim against Frenville for indemnification or contribution for any loss arising from the creditors' suit. The bankruptcy judge ruled in Frenville's favor, finding that its liability, if any, derived from its pre-petition acts.

The district court affirmed, and the Third Circuit framed the issue on appeal as follows:

We must decide today whether the automatic stay of Section 362(a) of the Code is applicable when the debtor's acts which form the basis of suit occurred pre-petition, but the actual cause of action which is being instituted did not arise until after the filing of the bankruptcy petition.

*Id.* at 334.

The Third Circuit found that Frenville's acts, which led to the accountant's suit for indemnification and contribution, occurred before the Chapter 7 petition was filed. *See id.* at 335. The court stated, however, that the debtor's pre-petition acts, by themselves, were not sufficient to evoke the automatic stay. *See id.* The court recognized that § 362(a)(1) refers to "proceedings" and "claims" against, rather than acts done by, the debtor. The court found that although in most cases the claim arises simultaneously with the underlying act, Congress focuses on the harm, as opposed to the act, when the claim and act arise separately. *See id.* at 335.

The court held that in order for the accountants to have a claim, there must be a "right to payment," and courts must focus on the point at which that "right of payment" arises. *See id.* at 336. The *Frenville* court noted that the accountants did not have an indemnity agreement with Frenville. *See id.* at 337. Thus, the court looked to state law to determine when a right to payment for an indemnity or contribution claim arises. *See id.* It found that under New York law, a claim for indemnification or contribution does not accrue until payment of a judgment which results from the underlying acts is made. *See id.* Nonetheless, a defendant may file a third party claim for such relief when it serves an answer. *See id.* Accordingly, the court concluded that until the suit was instituted against them in the post-petition period, the accountants had no claim for indemnity or contribution against Frenville. *See id.*

Grand Union argues, and this court agrees, that the *Frenville* analysis is applicable to the case at bar. As outlined above, the court in *Frenville* focused on when the right to payment arose and looked first at whether any contractual agreement governed the matter. In the absence of any such agreement, it then looked to applicable state law. In the instant matter, the terms of the Modification Agreement address when the claim for payment of CAM and real estate taxes arise and the court must consider those provisions in reaching its decision.

DeCicco counters that the recent Third Circuit decision, *In re First Jersey Securities, Inc.*, 180 F.3d 504 (3d Cir.1999), is more on point and that it supports the

accrual method, rather than the billing date approach. However, the Court finds that both *Frenville* and *First Jersey* are consistent with the billing date approach. *First Jersey* held that a legal claim arises when legal services are performed, rather than when the client receives the bill. *See id.* at 511. The court made this determination for purposes of determining when an antecedent debt arose within the meaning of § 547. As in *Frenville*, the Third Circuit in *First Jersey* determined when the right to payment arose. In each case, the court looked to the nature of the claims and the agreements between the parties. In essence, in *First Jersey* the Third Circuit ruled that the usual attorney-client relationship was extant between the debtor and its counsel. Accordingly, the debt was owed when services were actually rendered. *See id.* at 510–11. This ruling is not inconsistent with *Frenville.*

### *Application of the Billing Date Approach*

As outlined above, the Court follows the billing date approach, and holds that a debtor-in-possession leasing nonresidential real property must pay in full all obligations which come due during the post-petition, pre-rejection period, regardless of whether some of those charges accrued pre-petition.

■ Despite the Court's adoption of the billing date approach. Grand Union's cross-motion to compel DeCicco to pay the taxes and CAM as a post-petition obligation is denied except to the extent of DeCicco's share of the August 1, 1999 tax payments made by Haremak to the Borough of Montvale. The August, 1999 taxes were not included in the Marx certification filed in April 1999. Correspondingly, De-Cicco's motion is granted except for the Court's finding that the aforementioned real estate taxes are post-petition obligations under § 365(d)(3). Although the Court follows the approach suggested by Haremak, the language in the Lease Modification Agreement clearly indicates that DeCicco was obligated to pay the taxes

and CAM within thirty days of submission of a statement from Haremak. While De-Cicco did not make this argument, the Court's findings based on this reasoning obviously benefit the debtor.

The importance of the language of a contract should not be overlooked. There is no better example than this particular case. The use of the word "within" in both paragraphs five and six of the Lease Modification Agreement, makes it clear that DeCicco has an obligation to pay both CAM and taxes to Haremak during that thirty day period, starting from the "submission" of the statement of the amount due, and continuing forward thirty days. The parties chose the words that define the scope of their obligations, and the plain meaning of those words are evident in this case. By the very language of the Lease, DeCicco was obligated to pay the additional rent well before the thirtieth day. Indeed, the obligation arose on the first day of the thirty day time period. It merely became "overdue" on the thirty-first day. Since the Marx Certification was filed on April 16, 1999 and the Chapter 11 petition was not filed until May 13, 1999, DeCicco's obligation to pay the amount stated by Marx first arose well before the petition date.

While the specific language of paragraphs five and six of the Lease Modification Agreement does not make clear whether the thirty day period in which DeCicco must make payment begins to run the day Haremak sends a statement, the day DeCicco receives a statement, or somewhere in between (the language suggests to the Court that the tenant's obligation starts to run when it receives a statement). DeCicco's obligation to pay those taxes and CAM certainly arose before the petition date. Haremak submitted the statement for taxes and CAM to DeCicco on April 16, 1999. DeCicco filed for Chapter 11 relief on May 13, 1999, twenty seven days after Haremak submitted its statement for alleged taxes and CAM owed. Therefore, DeCicco's obli-

gation to pay the taxes and CAM arose on April 16, 1999 or a few days thereafter (allowing time for DeCicco to receive the invoice), and was hence, a pre-petition obligation. However, as to DeCicco's obligation for its share of the August 1, 1999 taxes paid by Haremak, it appears that the submission of a statement for those amounts was only made by virtue of the July 14, 1999 letter from Haremak's counsel. While the Court agrees with DeCicco's counsel that the amount demanded is not adequately supported as required by the terms of paragraph six of the Lease Modification, it nonetheless finds that it is a post-petition obligation under § 365(d)(3).

## CONCLUSION

■ The Court finds that § 365(d)(3) is unambiguous on its face, and adopts the billing date approach to the application of § 365(d)(3). Haremak is directed to supply DeCicco with the calculations and documentation required to support its request for DeCicco to pay its share of the August 1, 1999 real estate taxes. DeCicco shall immediately satisfy such obligations consistent with the terms of this Court's July 12, 1999 order. The Court finds that the balance of the taxes and CAM charges sought by Haremak in its July 14, 1999 letter are not post-petition obligations which must be satisfied as such under § 365(d)(3).

## *ORDER DETERMINING POST–PETITION OBLIGATIONS UNDER SECTION 365(d)(3)*

This matter having come before the court on the above debtor's motion to limit its post-petition obligations for additional rent to the amounts accruing after the commencement of its Chapter 11 case, the Grand Union Company having moved to require payment of post-petition obligations inclusive of CAM and real estate taxes accruing pre-petition, and Haremak Associates having filed opposition to the debtor's motion and support for Grand

Union's cross-motion, and the court having issued its opinion dated September 30, 1999.

IT IS, on this 30th day of September, 1999

ORDERED, that the debtor's motion is denied to the extent that it seeks an order declaring that under § 365(d)(3) the Debtors obligation to pay its share of CAM, real estate taxes and additional rent is limited to the amounts accruing after the petition date; and it is further

ORDERED, that the cross-motion of Grand Union Company is denied to the extent that it seeks to compel payment under § 365(d)(3) for the CAM, real estate taxes and additional rent contained in the Marx certification, and it is further

ORDERED, that the debtor shall pay Haremak Associates its share of the August 1, 1999 tax bill upon submission to it of the verified statement required by paragraph 6 of the Lease Modification.