### In re KOENIG SPORTING GOODS, INC., Debtor.

**Bankruptcy No. 97–15635.**

United States Bankruptcy Court, N.D. Ohio.

June 11, 1998.

Ellen Maglicic Kramer, Kohrman Jackson & Krantz, P.L.L., Cleveland, OH, for Morse Road Co.

Harry W. Greenfield, Nancy Heller, Buckley King & Bluso, Cleveland, OH, for Debtor.

### MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

The Debtor, which operated sporting goods stores in leased space in shopping centers, experienced financial troubles during the mid 1990's. It decided with the support of a committee of its suppliers to sell its business and assign its profitable leases and to reject the leases it could not assign. After filing this chapter 11 case in August 1997, the Debtor obtained from the Court an order under section 365 of the Bankruptcy Code authorizing it to reject any lease effective seven days after notice to the landlord. Pursuant to that order the Debtor on November 25, 1997 notified Morse Road Company ("Morse Road"), the lessor of the Debtor's store in Columbus, Ohio, that it intended to reject its lease with Morse Road. The parties agree that that notice effectively rejected the lease December 2, 1997.

On December 1, 1997, the Debtor was obligated under the lease to pay Morse Road approximately $8,500, $8,000 in rent and $500 in common area charges, for the month of December. However, Debtor did not make

that payment because it would have compensated Morse Road for 29 days in December that the Debtor did not occupy the leased premises. Debtor contends that Morse Road is entitled to only two days rent of about $550 for December. Morse Road does not question the Debtor's right to reject the lease or that Debtor had vacated the premises by December 2 but asserts that it is entitled to the full $8,500 December payment under the express terms of section 365(d)(3) of the Bankruptcy Code. Morse Road also attempted to buttress its statutory argument by complaining that the short seven-day rejection period afforded it inadequate time to relet the premises and that it is therefore entitled to the full month's rent, presumably as an administrative expense. There appears little merit to this complaint however. Morse Road was well aware of Debtor's plans and did not object to Debtor's motion fixing the seven-day rejection period. There was no evidence that Morse Road could have found another tenant for the premises had it received the rejection notice two days earlier. Nevertheless, it appears that Morse Road is entitled under section 365(d)(3) to payment of the full December payment rather than only two days' rental as the Debtor asserts.

### Analysis

There is a conflict in the cases as to whether section 365(d)(3) compels a debtor to pay all rent and other charges which become due under a lease during the postpetition prerejection period or whether, instead, it requires the debtor to pay only the rent and charges allocable to that period. *Compare Santa Ana Best Plaza, Ltd. v. Best Prods. Co. (In re Best Prods. Co.),* 206 B.R. 404, 406 (Bankr. E.D.Va.1997), *with In re Krystal Co.,* 194 B.R. 161, 163 (Bankr.E.D.Tenn.1996). Section 365(d)(3) provides:

The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days

after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

By and large the courts have framed the issue as whether section 365(d)(3) by its terms clearly compels the debtor to pay in full obligations becoming due postpetition but prerejection, even though allocable to another time period, or whether its terms are sufficiently malleable to permit the court to construe them to require payment only of rent and other charges allocable to the postpetition prerejection period. *See id.*

There is no question but that as a matter of ordinary language usage section 365(d)(3) appears to apply to obligations becoming due during the postpetition prerejection period. Based largely on this perception a minority of the courts that have considered the question has invoked the "plain meaning rule" to preclude further analysis of Congressional intent. This has resulted in courts ordering large payments to landlords relating to taxes attributable to prepetition or postrejection periods that would not have qualified for administrative expenses priority. *See In re R.H. Macy & Co.,* 152 B.R. 869 (Bankr. S.D.N.Y.1993), *aff'd sub nom. Bullock's Inc. v. Lakewood Mall Shopping Ctr. (In re R.H. Macy & Co.),* 1994 WL 482948 (S.D.N.Y. 1994); *Inland's Monthly Income Fund, L.P. v. Duckwall–ALCO Stores, Inc. (In re Duckwall–ALCO Stores, Inc.),* 150 B.R. 965 (D.Kan.1993).

■ The fact that a payment date interpretation flows naturally from the language of section 365(d)(3) is not, however, decisive under the plain meaning rule. The meaning of statutory language cannot be determined solely from the dictionary. Ordinary usage, however "plain," must be filtered through statutory definitions and usages of the same terms in other sections of the statute, as well as judicial interpretations that may have put

a gloss on dictionary definitions. This is particularly true in a statute as detailed and complex as the Bankruptcy Code whose terms have frequently been interpreted by the Supreme Court and lesser courts.

The fact that more than half of the courts that have considered this question have concluded that the language of section 365(d)(3) is ambiguous strongly suggests that linguistic analysis alone cannot resolve the question. The proponents of ambiguity focus on the phrase " obligations ... arising" in the first sentence of section 365(d)(3). That phrase could refer either to the facts and circumstances giving rise to the obligation, even though payment or performance is deferred, or to the date specified for payment or performance.

Neither this phrase nor the word "arise" is defined in the Code. However, the participle "arising," when used in the Code, often refers to the events giving rise to a claim or obligation. *See, e.g.,* 11 U.S.C. §§ 507(a)(4)(A), (a)(6), (a)(8)(F), (b), and (c); 510(b); 522(f)(2)(C); 523(a)(11); 524(g)(2)(B)(ii)(I); 922(a)(2). Where a payment or performance date is intended, Congress usually made this clear by choosing language other than "arising". *See* 11 U.S.C. § 1110(a)(1)(A) ("obligations of the debtor that become due on or after the date of the order"); 1168(a)(1)(A). It appears, therefore, that Congress knew how to dispel any uncertainty as to whether a provision of the Code was intended to refer to the time the events giving rise to the obligation occurred or to the date on which the obligation was to be performed and appears to provide textual justification for the Court to examine the legislative history of section 365(d)(3) for guidance as to whether Congress intended the word "arising" in section 365(d)(3) to cover lease obligations becoming due during the postpetition prerejection period or only obligations allocable to that period.

■ Unfortunately, however, that history, which consists of remarks by Senator Orrin Hatch in connection with the enactment of section 365(d)(3) in 1984, provides little help in choosing between a payment date or an allocation interpretation of section 365(d)(3).

Those remarks are in relevant part as follows:

A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor.

This bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

H.R.CONF.REP. No. 98–882 (1984), *reprinted in* 1984 U.S.C.C.A .N. 576, 599. The remarks of one legislator are at best a dubious guide to the intent of Congress, although their importance is enhanced to some extent by Senator Hatch's role on the Senate Judiciary Committee. Part of his statement supports the allocation interpretation in asserting that section 365(d)(3) was enacted to alleviate the perceived unfairness of requiring a landlord to provide "current services" to a debtor for which it was not currently compensated. "Current" clearly refers to the postpetition prerejection period. On the other hand, the first sentence of the second paragraph of Senator Hatch's remarks states that the bill was structured to address the landlord's problem "by requiring the trustee to perform all the obligations of the debtor under a lease of real property at the time required in the lease." This language obviously supports a performance date interpretation. Therefore, the only real support for an allocation interpretation stems from the

fact that a performance date interpretation conflicts with the principle of creditor equality and established law governing administrative expense priority.

■ Apart from section 365(d)(3), rent becoming due under a lease in the prerejection period would be entitled to priority only to the extent that it qualified as an administrative expense under section 503(b)(1) and section 507 of the Bankruptcy Code. The scope and limitations of administrative priority claims have evolved with some clarity in numerous cases decided under both the Bankruptcy Act and the Bankruptcy Code. *See, e.g., Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.),* 126 F.3d 811, 816 (6th Cir.1997). Under these cases it is clear that the rent payable to Morse Road for the 29 days in December following rejection of the lease would not qualify as administrative expense since rent for that period provided no benefit to the Debtor's estate.

Some courts have concluded that this principle has become so clearly enshrined in the law that Congress would not significantly change it without making clear its intent to do so. *See Nat'l Terminals Corp. v. Handy Andy Home Improvement Ctrs., Inc.,* 1997 WL 619824, at *8 (N.D.Ill.1997) (quoting *Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) for the proposition that "courts should be 'reluctant to accept arguments that would interpret the Code, however vague the particular language ... might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.' "). Moreover, the limitations on administrative expense priority are grounded on one of bankruptcy's two fundamental principles—equality of distribution among creditors. Moneys paid a landlord under section 365(d)(3) in excess of those it would be entitled to as a creditor are, in effect, funded by a debtor's other creditors.

Section 365(d)(3) explicitly refers to administrative expense but not in a way that provides a definitive answer to the present question. The first sentence of section 365(d)(3) obligates a debtor to timely perform its obligations under a lease "notwithstanding section 503(b)(1)." That section provides in relevant part:

> After notice and a hearing, there shall be allowed administrative expenses ... including ... the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....

Probably all courts would concur that the proviso in section 365(d)(3) was intended to make clear that neither notice nor a hearing was required as a prelude to 365(d)(3) payments to the landlord. Most courts would also agree that the proviso was intended to make clear that section 365(d)(3) payments were not limited by cases which had held that postpetition prerejection rent was entitled to administrative priority status measured not by the terms of the lease but by the actual benefit received by the debtor. It could also be argued, however, that the proviso was intended to deny the applicability of cases which have, nearly universally, limited administrative expenses to charges allocable to the postpetition prerejection period. This argument is plausible but not compelling given the fact that there are two other cogent interpretations of the section 503(b) proviso which do not impinge on the principal of equal distribution to creditors.

There is no easy or satisfying answer to this problem of statutory interpretation. Both a performance date and an allocation interpretation of section 365(d)(3) are consistent with the statutory language. The former flows more naturally from its ordinary meaning. It has the drawback, however, that it violates the principle of creditor equality and may provide the landlord a windfall that goes well beyond assuring the landlord payment for services provided during the postpetition prerejection period. The allocation interpretation avoids this problem but at the expense of permitting the debtor to omit a rental payment if the debtor plans to reject the lease prior to the end of the month.

■ Taking all of the foregoing factors into consideration, it appears that section 365(d)(3) was, at the least, intended to assure the landlord payment of ordinary monthly

rent payments which become due during the postpetition prerejection period. Since Congress was no doubt well aware that rental is usually paid monthly in advance, it is not really possible to reconcile section 365(d)(3) with according the Debtor the option not to pay its monthly rent when due, even though payment would impinge to some extent upon normal bankruptcy principles and priorities. As a practical matter debtors should usually be able to plan the time of lease rejection so as to minimize rent payments under section 365(d)(3) that would not qualify as administrative expenses under section 503(b).

Whether this same conclusion would follow if the Court were faced with the issue of awarding the landlord a year's rental for two days occupancy, in the unlikely event rent was payable yearly in advance, is an open question. Logic would demand the same result, but the lack of precision and clarity in the language of section 365(d)(3) may indicate that Congress intended the courts to exercise some discretion where an inflexible approach to section 365(d)(3) would severely distort fundamental bankruptcy principles. In any event, the Court need not and does not decide whether some lease obligations are sufficiently aberrant, such as yearly rent payable in advance or a large tax obligation relating to prepetition or postrejection periods, that their payment is not required under section 365(d)(3) because of conflict with the principle of equal distribution to an extent not intended by Congress.