## In re KOENIG SPORTING GOODS, INC., Debtor.

### Koenig Sporting Goods, Inc., Appellant,

v.

### Morse Road Company, Appellee.

### BAP No. 98–8055.

United States Bankruptcy Appellate Panel of the Sixth Circuit.

Argued Dec. 2, 1998.

Decided Feb. 16, 1999.

Nancy J. Heller, Harry W. Greenfield, Buckley, King & Bluso, Cleveland, Ohio, Argued and on Brief for Appellant.

Ellen Maglicic Kramer, Jonathan M. Yarger, KOHRMAN, JACKSON & KRANTZ, Cleveland, Ohio, Argued and on Breif for Appellee.

Before LUNDIN, RHODES, and WALDRON, Bankruptcy Appellate Panel Judges.

49. *Id.* (citations omitted).

## OPINION

The bankruptcy court, interpreting 11 U.S.C. § 365(d)(3), held that the Debtor's landlord was entitled to a full month's rent when the Debtor rejected a nonresidential lease and vacated the property on the second day of the month. We agree and affirm.

## I. ISSUE ON APPEAL[1]

Whether 11 U.S.C. § 365(d)(3) requires a debtor that rejects a nonresidential lease on December 2 to pay in full one month's rent that became due on December 1.

## II. JURISDICTION AND STANDARD OF REVIEW

■ The United States District Court for the Northern District of Ohio has authorized appeals to the BAP. The bankruptcy court's order requiring the Debtor to pay one month's rent under § 365(d)(3) is a final appealable order. *See In re Handy Andy Home Improvement Ctrs., Inc.*, 144 F.3d 1125 (7th Cir.1998). Interpretation of § 365(d)(3) is a question of law reviewed de novo. *Andersson v. Security Fed. Savs. & Loan (In re Andersson)*, 209 B.R. 76, 77 (6th Cir. BAP 1997).

## III. FACTS

Koenig Sporting Goods, Inc. ("Koenig" or "Debtor") operated retail sporting good stores in leased spaces in shopping centers. Koenig filed Chapter 11 in August of 1997. It sold many locations during the Chapter 11 case and, after liquidating inventory, rejected leases at its remaining stores. Morse Road Company was the landlord for a rejected lease.

Rejection of the Morse Road lease was effective on December 2, 1997. The Debtor vacated the property that day.

According to the lease, monthly rent of $8,500 for December 1997 became due on December 1, 1997. This rent was "payable in advance on the first (1st) day of each and every calendar month." (App. at 8) (Lease Agreement Between Morse Road Co. and Koenig Sporting Goods, Inc. at ¶ 5(a)).

Morse Road demanded payment of $8,500 for the month of December, citing 11 U.S.C. § 365(d)(3). The Debtor responded that it was in possession for only two days in December 1997 and the rent should be prorated, producing a recovery of approximately $550.

The bankruptcy court thoughtfully analyzed the conflicting case law interpreting § 365(d)(3) and concluded that "section 365(d)(3) was, at the least, intended to assure the landlord payment of ordinary monthly rent payments which become due during the

---

1. Appellant argues a second issue for the first time on appeal: that the lease itself limits the landlord's recovery to two days' rent. Paragraph 5(b) of the lease provides:

> (b) If the Lease term shall commence on a day other than the first day of a calendar month or shall end on a day other than the last day of a calendar month, the minimum rental for such first or last fractional month shall be such proportion of the monthly minimum rental as the number of days in such fractional month bears to the total number of days in such calendar month.

Appellate courts ordinarily do not consider issues raised for the first time on appeal. *See Zirnhelt v. Madaj (In re Madaj)*, 149 F.3d 467, 471 n. 4 (6th Cir.1998); *Harshbarger v. Pees (In re Harshbarger)*, 66 F.3d 775, 777 n. 3 (6th Cir. 1995). An argument is waived that is not first presented to the bankruptcy court. *See Daniel v. AMCI, Inc. (In re Ferncrest Court Partners, Ltd.)*, 66 F.3d 778, 782 (6th Cir.1995).

The Sixth Circuit recognizes exceptions to this general rule. Appellate courts have discretion to consider issues not raised in the trial court in "exceptional cases" or when "a plain miscarriage of justice" would otherwise result. *United States v. Reed*, 141 F.3d 644, 651–52 (6th Cir. 1998); *see also Norpak v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.)*, 131 F.3d 1185 (6th Cir.1997) (remanding appeal to prevent a miscarriage of justice); *Friendly Farms v. Reliance Ins. Co.*, 79 F.3d 541, 545 (6th Cir. 1996); *Kuper v. Iovenko*, 66 F.3d 1447, 1454 (6th Cir.1995) (new issue may be considered on appeal where it " 'is presented with sufficient clarity and completeness and its resolution will materially advance the progress of already protracted litigation' ").

The parties have not briefed paragraph 5(b) of the lease and certainly have not presented the paragraph 5(b) issue "with sufficient clarity and completeness" for the Panel to determine the effect of this provision. Nothing before the Panel suggests the presence of a "miscarriage of justice" nor has any new development interceded after the filing of this appeal. Accordingly, this is not the "exceptional case" in which it would be appropriate to consider the issue first raised on appeal.

postpetition prerejection period." *In re Koenig Sporting Goods, Inc.*, 221 B.R. 737, 740–41 (Bankr.N.D.Ohio 1998). The bankruptcy court acknowledged that requiring the Debtor to pay a full month's rent for December "would impinge to some extent upon normal bankruptcy principles and priorities," but concluded that this dissonance was compelled by the choices Congress made when it enacted § 365(d)(3) in 1984 to protect nonresidential landlords from debtors in bankruptcy. *Id.* at 741. The bankruptcy court reserved the possibility that on other facts § 365(d)(3) might require "some discretion" to avoid "severe[ ] distor[tion of] fundamental bankruptcy principles." *Id.*

The Debtor timely appealed.

## IV. DISCUSSION

The plain language of § 365(d)(3) fully supports the bankruptcy court's conclusion that the Debtor must pay one month's rent that became due under its lease on December 1, 1997. Section 365(d)(3) provides:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

11 U.S.C. § 365(d)(3).

The Morse Road lease is typical in its requirement that the Debtor pay rent in advance on the first day of each month. The requirement to pay one month's rent on December 1 was an "obligation of the debtor" that arose after the order for relief and (one day) before the lease was rejected. Writing on a clean slate, we would prudently end our analysis with this plain language application of § 365(d)(3).

The slate, however, is hardly clean. The bankruptcy court succinctly summarized the many reported decisions interpreting § 365(d)(3):

> There is a conflict in the cases as to whether section 365(d)(3) compels a debtor to pay all rent and other charges which become due under a lease during the post-petition prerejection period or whether, instead, it requires the debtor to pay only the rent and charges allocable to that period. *Compare Santa Ana Best Plaza, Ltd. v. Best Prods. Co. (In re Best Prods. Co.)*, 206 B.R. 404, 406 (Bankr.E.D.Va.1997), *with In re Krystal Co.*, 194 B.R. 161, 163 (Bankr.E.D.Tenn.1996).... [T]he courts have framed the issue as whether section 365(d)(3) by its terms clearly compels the debtor to pay in full obligations becoming due postpetition but prerejection, even though allocable to another time period, or whether its terms are sufficiently malleable to permit the court to construe them to require payment only of rent and other charges allocable to the postpetition prerejection period.

*Koenig Sporting Goods*, 221 B.R. at 738.

Although the cases do not divide perfectly, the two approaches to § 365(d)(3) can be described as the Accrual (Allocation/Proration) Approach (majority) and the Billing Date Approach (minority).

A statement of the Billing Date Approach would be that any amount coming due under a lease in the postpetition, prerejection period must be paid in full by the debtor without regard to whether the payment pertains to a prepetition or postrejection benefit. Decisions that adopt the Billing Date Approach include *Inland's Monthly Income Fund, L.P. v. Duckwall–ALCO Stores, Inc. (In re Duckwall–ALCO Stores, Inc.)*, 150 B.R. 965 (D.Kan.1993) (holding that § 365(d)(3) is clear and unambiguous in requiring that the debtor comply with all obligations arising under the lease after the petition); *In re Krystal Co.*, 194 B.R. 161, 163 (Bankr. E.D.Tenn.1996) (holding a plain reading of § 365(d)(3) precludes an accrual and proration analysis); *In re F & M Distribs., Inc.*, 197 B.R. 829, 832 (Bankr.E.D.Mich.1995) ("[B]ecause § 365(d)(3) is unambiguous, this Court must follow its plain language without regard to any equitable or policy considerations."); and *In re Appletree Markets Inc.*, 139 B.R. 417, 420 (Bankr.S.D.Tex.1992) ("[T]he plain meaning of Section 365(d)(3) provides for payment of obligations arising after the petition is filed, not before.").

Under the Accrual Approach, a debtor is required by § 365(d)(3) to pay only those sums coming due under a lease during the postpetition, prerejection period that pertain to benefits realized by the estate during that period. Under the Accrual Approach a debtor is not required to pay for any benefit conferred before the petition is filed or after rejection occurs regardless of when the payment for that benefit became due under the lease. Decisions adopting some form of the Accrual Approach include *Newman v. McCrory Corp. (In re McCrory Corp.)*, 210 B.R. 934, 940 (S.D.N.Y.1997) ("[T]he debtor-tenant's obligations under the lease to pay real estate taxes accrues on a daily basis and ..., under § 365(d)(3), postpetition bills must be prorated so that the debtor only pays those charges accruing during the postpetition, prerejection period." (footnote omitted)); *Child World, Inc. v. Campbell/Massachusetts Trust (In re Child World, Inc.)*, 161 B.R. 571, 576 (S.D.N.Y.1993) (holding § 365(d)(3) only requires timely payment of lease obligations billed during the postpetition, prerejection period, that actually cover the postpetition, prerejection period); *In re Victory Markets, Inc.*, 196 B.R. 6 (Bankr. N.D.N.Y.1996) (adopting Accrual Approach and finding that § 365(d)(3) is ambiguous in context of a lease obligation to reimburse a landlord for real estate taxes); *In re Almac's, Inc.*, 167 B.R. 4, 8 (Bankr.D.R.I.1994) (addressing "the appropriate formula for determining when a tax obligation arises, for purposes of payment under § 365(d)(3)"); and *In re Revco D.S., Inc.*, 111 B.R. 626, 629 (Bankr.N.D.Ohio 1989) ("All percentage rent earned from the beginning of the bankruptcy administration to the end of the Lease year should be paid as .... a postpetition expense of the Debtors' estate [under § 365(d)(3).]" No portion relating to the prepetition period is allowed under § 365(d)(3).) *See also Handy Andy*, 144 F.3d at 1128 (adopting neither approach but holding that an "obligation to pay or reimburse the taxes that accrued prepetition is a prerather than postpetition obligation.... There is no indication that Congress meant to go any further than to provide a landlord exception to 503(b)(1), and thus no indication that it meant to give landlords favored treatment for any class of prepetition debts.").

The argument for the Billing Date Approach was ably stated in *Krystal Company:*

> The most natural reading of § 365(d)(3) leads to the conclusion that Congress meant to require payment of all the debtor's obligations falling due under its lease until such time as the debtor rejects the lease in question. Essentially the statute requires the debtor to "timely perform" its "obligations ... under any unexpired lease ...." until the lease has been assumed or rejected. That language clearly includes tax reimbursement payments to the landlord if and when called for by the lease. The problem is caused by the additional language of the statute, "arising from and after the order for relief," which modifies the word "obligations." Courts adopting the accrual theory believe this language allows them to adhere to the pre–1984 (presection 365(d)(3)) practice of prorating taxes between the prepetition and prerejection periods because they mistakenly assume that the "arising from" language of the statute means that the obligation must somehow arise from the prerejection period—that is, be an administrative expense—before the obligation is payable.

This court disagrees because other language within the statute, "notwithstanding section 503(b)(1) of this title," directly precludes viewing such obligations as administrative expenses. The "notwithstanding" phrase means that the obligations in question are to be paid "in spite of" the operation of § 503(b)(1), which would otherwise limit postpetition payments to those necessary for "preserving the estate." Thus, these prerejection obligations are not to be viewed as administrative expenses, but as obligations to be "timely perform[ed]" under the lease. Moreover, since the payment of these obligations is not designed to preserve the estate (but rather the vulnerable landlord), the concepts of accrual, proration and allocation—so necessary for distinguishing between prepetition debts and administrative expenses in the context of § 503(b)(1)—are irrelevant and inapplicable under § 365(d)(3).

That § 365(d)(3) was designed to protect the landlord rather than the estate by disarming § 503(b)(1)'s practices and procedures may be readily seen in the legislative history of § 365(d)(3).... [Remarks of Sen. Hatch reprinted below.]

.　　.　　.　　.　　.

Senator Hatch's remarks avoid the confusing "arising from and after" language of § 365(d)(3) and significantly make no mention of the concepts of accrual or proration of charges. There is no mention of "actual or necessary" expenses as might be expected if § 503(b)(1) were still operative. There is only the categorical "timely performance requirement" as an antidote to the problems "caused ... by the administration of the bankruptcy code." When read in conjunction with the statute as it must be, this "problem" language can only refer to § 503(b)(1), for that is the subsection specifically overridden by the amendment. Section 503(b)(1)'s essential concepts, accrual and proration, cannot be shown to have survived in § 365(d)(3), where they are unnecessary on a plain reading of the statute, and it makes no sense to force them.

The legislative solution to a problem need not necessarily be a perfect solution, and there are doubtless cases that can be imagined in which the court's reading of the statute in question might produce dubious results, as where rent or some other lease obligation is payable in one yearly installment, or perhaps every several years. Actually, these situations are not nearly as serious as they might seem at first blush, and policy arguments based on supposed anomalous results ... overlook remedies already available in the Code.

From a reading of the statute and its legislative history, it appears that Congress specifically intended to except a tenant's lease obligations to his landlord from the workings of the Code's administrative expense provisions because Congress believed nonresidential landlords and their other solvent tenants were particularly vulnerable creditors under the old procedures. Rather than forcing the landlord to take the initiative, apply for, and wait for

an administrative expense allowance, as it was required to do before 1984, Congress intended § 365(d)(3) to shift the burden of indecision to the debtor: the debtor must now continue to perform all the obligations of its lease or make up its mind to reject it before some onerous payment comes due during the prerejection period. That is a sensible adjustment of this particular debtor-creditor relationship.

*Krystal Co.,* 194 B.R. at 163–64 (internal citations omitted).

The rationale behind the Accrual Approach is fully stated in *McCrory:*

While the term "obligation" itself may be unambiguous, the language of § 365(d)(3) simply does not answer the question at hand. The phrase "arising from and after the order for relief under any unexpired lease of nonresidential real property" is far from clear. Nor is it clear whether the phrase "until such lease is assumed or rejected" limits the "obligation" in question to those actually accruing before rejection. Accordingly, I find it useful to turn to the legislative history of § 365(d)(3), as well as the overall operation of the Code, for guidance in construing § 365(d)(3).

In recent cases interpreting the Bankruptcy Code, the Supreme Court has tempered its application of the plain meaning rule, particularly when it would effect a major change in practice under the Code as it existed at the time, unless there is support for such a change in the legislative history. As the Second Circuit has explained:

When Congress amends the bankruptcy laws, it does not write on a clean slate.... Furthermore, [the Supreme Court] has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a change in pre-Code practice that is not the subject of at least some discussion in the legislative history.

*In re Klein Sleep Prods., Inc.,* 78 F.3d 18, 27 (2d Cir.1996) [ (citation omitted) ]; *In re R.H. Macy & Co., Inc.,* 170 B.R. 69, 73 (Bankr.S.D.N.Y.1994) ("even within the fluctuating walls of the 'plain meaning' for-

tress a court should not resolve questions of statutory interpretation so that a particular Bankruptcy Code section conflicts and disturbs the overall purpose and function of the Code") (citations omitted)[.]

Here, neither the language of the statute nor the legislative history reveals a Congressional intent to deviate from the pre-amendment practice of prorating lease obligations pending rejection, other than to require "current payment" for "current services." Rather, "Congress enacted § 365(d)(3) to ensure that landlords would not be disadvantaged by providing post-petition services to the debtor. Put another way, Congress intended the subsection to put landlords on an equal footing, not to grant them a windfall at the expense of other creditors." The approach followed by the [Billing Date] courts would drastically alter the priority and distribution scheme under the Bankruptcy Code.

Reliance strictly on the billing date would result in a windfall either to the landlord or to the debtor-tenant. A windfall would flow to the landlord here if McCrory were required to pay the 1996 real estate taxes in full, since the landlord would have recovered taxes for the coming year and could then relet the property and recover again fully or partially for those same tax bills. At the same time, McCrory would be required to pay a year's worth of taxes even though it was only in possession for one month before the leases were rejected. On the other hand, a windfall would flow to the debtor-tenant where annual taxes for the coming year fell due one day before the petition is filed, and thus get paid pro-rata along with all other unsecured, pre-petition creditors. Neither scenario can be what Congress had in mind when it acted to ensure that landlords received timely payment for the services they were forced to provide pending assumption or rejection of the lease.

> ... There is no indication that Congress intended to modify pre-Code practice to eliminate proration under these circumstances, in light of any other remedies that might be available under the Code.

In contrast, the [Accrual Approach] appears to serve not only the interests of the debtor but those of the landlord and other creditors as well. The majority reasoning is particularly compelling, and the .shortcomings of the minority's application of the plain meaning rule are especially evident, on the facts before me in this case. In addition, "[t]he bankruptcy court is essentially a court of equity ... [and it] applies the principles and rules of equity jurisprudence."

*McCrory*, 210 B.R. at 939–40 (internal citations and footnotes omitted).

The historical setting mentioned in these quotes is that § 365(d)(3) did not exist until 1984. Prior to 1984, landlords complained that the Code created a "Neverland" between the filing of a bankruptcy case and a debtor's decision to assume or reject a lease. During this time of indecision, rents and other obligations under leases were sometimes not performed. The resulting debts were sometimes allowed in full as administrative expenses, sometimes reduced to reflect differing notions of "necessity," "reasonableness" and "benefit" under § 503(b) and sometimes became (in whole or part) ordinary prepetition claims.

In 1984, Congress changed the relationship between debtors and their nonresidential landlords. Senator Orrin Hatch's oft-quoted explanation of § 365(d)(3) provides ammunition for all sides of the § 365(d)(3) debate:

> A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor.

·This bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

130 Cong. Rec. S8887, S8894–95 (daily ed. June 29, 1984) (remarks of Senator Hatch).

█ The Sixth Circuit has not taken sides in the § 365(d)(3) debate. But in a bankruptcy context with many important similarities, the Sixth Circuit suggested the outcome reached by the bankruptcy court in this case. In *Vause v. Capital Poly Bag, Inc. (In re Vause)*, 886 F.2d 794 (6th Cir.1989), the debtors filed Chapter 11 four days before a lease required a $36,000 annual rental payment for the use of farm land. Concurrently with the petition, the debtors rejected the lease. The lease in *Vause*, though typical for farm leases, was unusual in that rent for each year was payable once annually *in arrears*.

The landlord filed a proof of claim that included $36,000 for the 361 days of use of the land through the date of the petition. The debtors objected arguing under § 502(b)(6)(B) [2] that there was no "unpaid rent due under such lease" on the petition date because the lease did not require payment until four days after the petition was filed.

The Sixth Circuit found the word "due" in § 502(b)(6)(B) to be ambiguous in the context of a lease that made rent payable in arrears: In this peculiar context, "due" could mean "'the mere state of indebtment ... or ... the fact that the debt has become payable.'" *Id.* at 799 (quoting *United States v. State Bank of N.C.*, 31 U.S. (6 Pet.) 29, 36, 8 L.Ed. 308 (1832)). The court consulted legislative history, other canons of statutory construction and equitable considerations, ultimately concluding that the landlord was entitled to 361 days of "accrued" prepetition rent.

But the Sixth Circuit was careful in *Vause* to state that the ambiguity it found in § 502(b)(6) would not arise if the lease required payments in advance. As stated by the court, "Section 502(b)(6) is not difficult to apply when a lease does not make rent payable in arrears. It limits a lessor's claim to actual past damages for unpaid rent due under the lease.... The problem arises when lease payments are payable in arrears." *Id.* at 798–99 (footnote omitted).

The analytical framework in *Vause* is useful here and supports the bankruptcy court's conclusion. The meaning of "obligations ... arising ... under any unexpired lease" in § 365(d)(3) is not ambiguous in the narrow context of a lease that required payment of one month's rent in advance the day before rejection.

As the Sixth Circuit counsels in *Vause*, this interpretation of § 365(d)(3) must be confined to these facts. Left for another day is the question whether ambiguities of interpretation arise under § 365(d)(3) when a nonresidential lease requires substantial payments in arrears or imposes obligations that are fundamentally inconsistent with other provisions of the Bankruptcy Code.

## V. CONCLUSION

The decision of the bankruptcy court is **AFFIRMED.**

RHODES, J., dissenting.

A majority of courts have recognized that the meaning of § 365(d)(3) is anything but plain and that the performance date approach [1] can lead to outrageous conse-

---

2. Section 502(b)(6)(B) concerns the allowance of claims and provides:

> (b) Except as provided ..., if [a party's] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>
> . . . . .
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]

11 U.S.C. § 502(b)(6)(B).

1. The terms "performance date approach" and "proration approach" are used because they

quences. Instead of confronting these problems, the Panel follows the lead of the bankruptcy court and simply leaves them "for another day." In merely announcing a result for this case, the Panel opinion thus neither announces nor adopts any rule of decision. Moreover, the Panel's suggestion that in certain circumstances there may be "ambiguities of interpretation" contradicts its conclusion that the statute's "plain meaning" compels the performance date approach. Only the proration approach, adopted in a majority of cases, applies § 365(d)(3) in a manner that is consistent not only with the language of § 365(d)(3), but also with the Bankruptcy Code as a whole, common sense, the legislative history, and Sixth Circuit precedent. Accordingly, the bankruptcy court's order should be reversed.

In the present case, although only two days passed in the calendar month when the Debtor rejected the lease and vacated the premises, the Panel's judgment requires the Debtor to pay the entire month's rent of $8,500. Approximately $7,950 of that monthly rent was for the twenty-eight days after the rejection and after the Debtor returned possession of the premises to the landlord. The issue is whether § 365(d)(3) requires the bankruptcy court to award that windfall.

## I.

"The objective of statutory construction is to 'ascertain the intent of Congress.'" *Vause v. Capital Poly Bag, Inc. (In re Vause)*, 886 F.2d 794, 798 (6th Cir.1989) (citing *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975)). "The starting point in determining legislative intent is the language of the statute itself." *Id.* (citing *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *Watt v. Alaska*, 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981)).

Section 365(d)(3) provides:

The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from

and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

11 U.S.C. § 365(d)(3).

The question of statutory interpretation in this case is to define the "obligations of the debtor ... arising from and after the order for relief under any unexpired lease of non-residential real property, until such lease is ... rejected." § 365(d)(3). The bankruptcy court joined the majority of cases in noting, "Both a performance date and an allocation interpretation of section 365(d)(3) are consistent with the statutory language." *In re Koenig Sporting Goods, Inc.*, 221 B.R. 737, 740 (Bankr.N.D.Ohio 1998). *McCrory Corp.*, quoted by the Panel, stated that this phrase in § 365(d)(3) is "far from clear," and that "the language § 365(d)(3) simply does not answer the question at hand." *Newman v. McCrory Corp. (In re McCrory Corp.)*, 210 B.R. 934, 939 (S.D.N.Y.1997). *See also In re All for A Dollar*, 174 B.R. 358, 361 (Bankr. D.Mass.1994) ("Congress did not explicitly address whether obligations owed under a lease, albeit at the contract rate, should be allocated."); *In re Krystal Co.*, 194 B.R. 161, 164 (Bankr.E.D.Tenn.1996) (In adopting the performance date approach, the court conceded "there are doubtless cases that can be imagined in which the court's reading of the statute in question might produce dubious results[.]").

Accordingly, in determining the intent of § 365(d)(3), it is necessary and appropriate to examine other considerations, including the structure and purposes of the Bankruptcy Code as a whole, common sense, pre-enactment law, the legislative history, and related Sixth Circuit precedent. Examination of each of these considerations fully demonstrates the merit of the proration approach.

## II.

"'Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.'" *Vause*, 886 F.2d

more accurately reflect the substance of each

approach.

at 803 (quoting *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982)). "[C]ommon sense and evident statutory purpose must prevail." *Wisconsin Higher Educ. Aids Bd. v. Hogan (In re Hogan ),* 707 F.2d 209, 211 (5th Cir.1983) (citing *United States v. Brown,* 333 U.S. 18, 26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948); *United States v. Babcock,* 530 F.2d 1051, 1053 (D.C.Cir.1976)). See also *New York State Higher Educ. Serv. Corp. v. Adamo (In re Adamo ),* 619 F.2d 216, 222 (2d Cir.), *cert. denied, sub nom. Williams v. New York State Higher Educ. Serv. Corp.,* 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980); *Santa Ana Best Plaza, Ltd. v. Best Prods. Co.(In re Best Prods. Co.),* 206 B.R. 404, 407 n. 2 (Bankr.E.D.Va.1997) ("Indeed, 'even within the fluctuating walls of the "plain meaning" fortress, a court should not resolve questions of statutory interpretation so that a particular Bankruptcy Code section conflicts and disturbs the overall purpose and function of the Code.'") (quoting *In re R.H. Macy & Co.,* 170 B.R. 69, 73 (Bankr.S.D.N.Y. 1994)).

In the present context, the structure and purposes of the Bankruptcy Code as a whole, as well as simple common sense, suggest that the statute should not be interpreted to require the payment of a windfall. "Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed." *Trustees of the Amalgamated Ins. Fund, v. McFarlin's, Inc.,* 789 F.2d 98, 100 (2nd Cir.1986) (citations omitted).

A landlord can receive a windfall in two ways under the billing date approach. First, a windfall can result from a debtor's postpetition, prerejection payment to a landlord for prepetition services that would otherwise be an unsecured claim. *See Best Prods.,* 206 B.R. 404 (The landlord billed the debtor for six months of taxes as additional rent, including approximately three months of prepetition taxes.); *Child World, Inc. v. Campbell/Massachusetts Trust (In re Child World, Inc.),* 161 B.R. 571, 575 (S.D.N.Y.1993) (A six month tax bill became due during the postpetition, prerejection period, which included

taxes for four months prepetition.). This windfall gives the landlord a preference that potentially prejudices both the debtor in its effort to reorganize and other unsecured creditors who may receive a reduced dividend.

Second, a windfall can result from a debtor's advance payment of rent during the postpetition, prerejection period, if the lease is rejected. Under this scenario, the debtor pays for services the landlord will not be obligated to provide. *See McCrory Corp.,* 210 B.R. 934 (A full year's taxes fell due during the postpetition, prerejection period, covering a substantial postrejection period as well.); *In re All for A Dollar, Inc.,* 174 B.R. 358 (Bankr.D.Mass.1994) (A six month tax bill became due during the postpetition, prerejection period, including taxes for three months after rejection.). Under these circumstances, a landlord can enter into a new lease for the property and charge the new tenant for the same services for which the debtor had already paid. Indeed, "a lessor has a duty to mitigate its damages." *Unsecured Creditors' Committee of Highland Superstores, Inc. v. Strobeck Real Estate, Inc. (In re Highland Superstores, Inc.),* 154 F.3d 573, 577 (6th Cir.1998). Regardless, the windfall payment again unfairly prejudices the debtor and other unsecured creditors.

The windfall consequences of the performance date approach are not limited to scenarios that unfairly favor the landlord. This approach can also be prejudicial to the landlord. Suppose that under the parties' lease, a year's rent was due the day before the bankruptcy case was filed and was not paid. There would be no performance date during the postpetition, prerejection time period and thus no immediate payment to the landlord under § 365(d)(3). *See McCrory Corp.,* 210 B.R. at 939. The prejudice resulting to the landlord in these circumstances is clear.

Indeed, both the Panel and the bankruptcy court recognize that the performance date approach is too inflexible to deal with such circumstances fairly and justly. The Panel states, "Left for another day is the question whether ambiguities of interpretation arise under § 365(d)(3) when a nonresidential lease requires substantial payments in ar-

rears or imposes obligations that are fundamentally inconsistent with other provisions of the Bankruptcy Code." (Panel Op. at 394.) The bankruptcy court stated, "[T]he lack of precision and clarity in the language of section 365(d)(3) may indicate that Congress intended the courts to exercise some discretion where an inflexible approach to section 365(d)(3) would severely distort fundamental bankruptcy principles." *Koenig Sporting Goods*, 221 B.R. at 741. The Panel's adoption of the performance date approach in the face of this recognized inflexibility is puzzling.

The Sixth Circuit has echoed the Supreme Court in stating, " 'The canon of strict construction is not an inexorable command to override common sense and evident statutory purpose.' " *Vause*, 886 F.2d at 800 n. 9 (quoting *United States v. Brown*, 333 U.S. at 25, 68 S.Ct. 376.) In this case, common sense dictates the wisdom of applying an approach that *in each case* accommodates the interests of all concerned in a fair and balanced way. The proration approach accomplishes that result, and because it is fully consistent with the language of § 365(d)(3), it ought to be applied.

### III.

The United States Supreme Court has held that it " 'would not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.' " *Cohen v. De La Cruz*, 523 U.S. 213, ——, 118 S.Ct. 1212, 1218, 140 L.Ed.2d 341, 348 (1998) (quoting *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 563, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990)). *See also Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The court has followed this rule with particular care in construing the scope of bankruptcy codifications.").

Before § 365(d)(3) was enacted in 1984, courts uniformly applied the proration approach under § 503(b)(1) to "allow as an administrative expense the full amount of the rent, as long as it was not clearly unreasonable, prorated over the postpetition, prerejection period." *Child World*, 161 B.R. at 574 (citations omitted). Since 1984, "[t]he majority of courts [construing § 365(d)(3) ] have adhered to the long-standing, pre–1984 practice of prorating payment of a debtor's obligations under a lease, regardless of the billing date." *McCrory Corp.*, 210 B.R. at 937 (collecting cases). As *Child World*, concluded, "Nothing in the legislative history indicates that Congress intended § 365(d)(3) to overturn the long-standing practice under 503(b)(1) of prorating debtor-tenant's rent to cover only the postpetition, prerejection period, regardless of billing date." *Child World*, 161 B.R. at 575–76. *See also McCrory Corp.*, 210 B.R. at 937; *Best Prods.*, 206 B.R. at 406–407.

### IV.

Interestingly, courts on *both* sides of the issue rely on the same remarks of Senator Hatch in support of their respective conclusions:

A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services-the use of its property, utilities, security, and other services without current payments. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor.

The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area

charges, and other charges on time pending the trustee's assumption or rejection of the lease.

130 CONG. REC. S8887, S8994–95 (daily ed. June 29, 1984) (remarks of Senator Hatch).

While Senator Hatch's remarks are far from conclusive, they do provide insight into the Congressional intent. One of the problems addressed by the statute arises when a debtor vacates a premises and stops paying rent but does not formally reject the lease. Congress noted that the landlord cannot lease the premises until after rejection of the lease and cannot pursue the debtor for payment for the postpetition rent. Thus, one purpose of § 365(d)(3) was to require continued payment of rent until the lease is formally rejected. The majority of courts have concluded that the limited available legislative history suggests that Congress only intended to protect the landlord's right to payment for services that the landlord is obligated to provide during the postpetition, prerejection period. For example, the *McCrory* court interpreted Senator Hatch's remarks to indicate "that Congress sought only to ensure that landlords received 'current payment' for 'current services' provided." Continuing the longstanding use of the proration approach carries out that Congressional intent.

## V.

As the majority opinion notes, the Sixth Circuit has not yet adopted either the proration approach or the performance date approach. The Panel concludes that the Sixth Circuit's decision in *Vause*, 886 F.2d 794, supports the performance date approach. However, both the rationale and the results of that case strongly suggest otherwise.

In *Vause*, the debtor was a farmer and his lease required annual rent payments in arrears. A payment became due four days after the debtor filed bankruptcy. The landlord filed a prepetition claim for that rent (as well as for one year's postpetition rent.) The debtor objected to the claim, arguing that § 502(b)(6)(B) limits a landlord's claim to the amount "due under the lease" and that the rent was not "due" until after the petition was filed. The bankruptcy court sustained

the objection, holding that under the plain meaning of § 502(b)(6)(B), the rent was not "due" until after the petition was filed. The district court affirmed on the same grounds.

The Sixth Circuit reversed. Initially, the court concluded that the term "due" has a double meaning. It might mean either "presently matured and enforceable" or "the mere state of indebtment." *Id.* at 799–800. The court then looked to the legislative history of § 502(b)(6)(B) and determined that "Congress intended to compensate landlords for their actual damages while placing a limit on large future, speculative damages which would displace other creditors' claims." *Id.* at 801–802. At the conclusion of its summary of the legislative history, the court observed, "The lower courts' interpretation of the section in a way which eliminates past damages based on the fortuity of the filing date does not comport with the balance Congress has attempted to strike between the affected parties." *Id.* at 803.

Finally, the court examined the equities involved, stating, "[E]quitable considerations require interpreting 'due' in the sense of 'owing' in order to prevent the debtors, who had the use of [the lessor's] land for 361 days, from receiving a windfall based on the fortuity of the filing date. The lower courts themselves acknowledged the inequities." *Id.* After reviewing the consequences of the bankruptcy court's holding in a number of possible scenarios, the Sixth Circuit concluded, "The potential for untenable distinctions and unreasonable results is readily apparent in this case." *Id.* The court further stated that the bankruptcy court's "reading of the statute ignores a fundamental tenet of the Bankruptcy Code requiring equal treatment of similarly situated creditors." *Id.* (citing *Sumy v. Schlossberg*, 777 F.2d 921, 932 (4th Cir.1985); *In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1342 (5th Cir.1984)).

Accordingly, based on the ambiguity in the statutory language, the legislative history and the equities in the case and in related scenarios, the court rejected the view that the plain meaning of § 502(b)(6)(B) required sustaining the debtor's objection to the landlord's claim. Rather, the court ordered that the landlord's claim be prorated.

The similarities to the present case are striking. Just as the term "due" in § 502(b)(6)(B) is ambiguous, so is the term "obligation" in § 365(d)(3). Indeed, as noted, the bankruptcy court, the district court and the Panel have so observed. Just as "the legislative history [of § 502(b)(6)(B) ] allows a reasonable interpretation in this case which 'strikes the balance between creditor protection and debtor relief that Congress intended, and is eminently reasonable, fair, and sensible[,]'" the legislative history of § 365(d)(3) allows for a similarly reasonable interpretation. *Vause*, 886 F.2d 794 (quoting *In re Southwest Aircraft Servs., Inc.*, 831 F.2d 848, 853 (9th Cir.1987), *cert. denied, sub nom. City of Long Beach v. Southwest Aircraft Servs., Inc.*, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988)). Just as *Vause* examined equitable considerations in applying § 502(b)(6)(B) both to the specific facts of that case and also to related scenarios, it is necessary and appropriate to do so in applying § 365(d)(3) in this case, and not to leave them for another day. Finally, just as *Vause* determined that those equitable considerations in the application § 502(b)(6)(B) require proration of the landlord's claim, the similar concerns about potential windfalls in the application of § 365(d)(3) require the application of the proration approach.

The Panel mistakenly concludes that *Vause* supports the performance date approach based on the Sixth Circuit's observation that if the lease requires payments in advance, then § 502(b)(6) is not difficult to apply. *Id.* at 798–99. The court's point was that in that scenario, either of the two meanings of the term "due" leads to the same result for the landlord. The same observation simply cannot be made regarding the term "obligation" in § 365(d)(3) in the present case, as the Panel itself notes. The lease in the present case does require rent payments in advance, and it is precisely that fact that raises the equitable concerns about requiring a windfall payment to the landlord. In the present case that windfall is $7950, which could and should rather be made available to support the debtor's reorganization.

## VI.

The only court of appeals to address the issue has joined the majority in adopting the proration approach. *In re Handy Andy Home Improvement Ctrs., Inc.*, 144 F.3d 1125 (7th Cir.1998). The issue in that case arose from a postpetition, prerejection bill for real estate taxes. The Seventh Circuit stated:

> Statutory language like other language should be read in context. *Textron Lycoming Reciprocating Engine Division v. United Auto., Aerospace & Agric. Implement Workers*, 523 U.S. 653, 118 S.Ct. 1626, 1629, 140 L.Ed.2d 863 (1998); *Sundstrand Corp. v. Comm'r*, 17 F.3d 965, 967 (7th Cir.1994), [*cert. denied*, 513 U.S. 821, 115 S.Ct. 83, 130 L.Ed.2d 36 (1994) ]; *Bell Atlantic Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 ·(D.C.Cir.1997). The context consists not merely of other sentences but also of the real-world situation to which the language pertains. Here that situation concerned a class of postpetition debts. That is all that Congress was legislating in reference to. When context is disregarded, silliness results. The rule for which [the lessee] contends would make the rights of creditors turn on the happenstance of the dating of tax bills and the strategic moves of landlords and tenants.

*Handy Andy*, 144 F.3d at 1128.

As *Handy Andy* suggests, the results of the performance date approach can turn upon random happenstance. Although the Seventh Circuit's characterization of this as "silliness" may be exaggerated, the bankruptcy court's order should nevertheless be reversed.